# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. McKinney*, 2011 IL App (1st) 100317

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JAMES McKINNEY, Defendant-Appellant. |
| District & No. | First District, Second Division<br>Docket No. 1-10-0317 |
| Filed | December 13, 2011 |
| Rehearing denied | January 10, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | On appeal from defendant's conviction for first-degree murder in a gang-related shooting, the appellate court held, *inter alia*, that the grant of a 30-day extension of time beyond the speedy trial term was not an error, that the failure to appoint new counsel following a *Krankel* hearing was not error, and that the 30-year sentence imposed to be served consecutively to an unrelated federal sentence was not an abuse of discretion. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 07-CR-6580; The Hon. Rosemary Grant-Higgins, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on Appeal | Michael J. Pelletier, Alan D. Goldberg, and Christopher L. Gehrke, all of State Appellate Defender's Office, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Michelle Katz, Peter Fischer and Kathleen Warnick, Assistant State's Attorneys, of counsel), for the People.

Panel | JUSTICE CUNNINGHAM delivered the judgment of the court, with opinion.
Presiding Justice Quinn and Justice Harris concurred in the judgment and opinion.


# OPINION

¶ 1    Following a jury trial in the circuit court of Cook County, the defendant, James McKinney, was convicted of first-degree murder and sentenced to 30 years of imprisonment. On direct appeal, the defendant argues that: (1) the trial court violated his right to a speedy trial when it granted the State a 30-day extension of time beyond the speedy trial term; (2) the trial court erred in admitting evidence of the defendant's postarrest silence; (3) the State misstated the law and improperly bolstered the credibility of witnesses' prior inconsistent statements during closing arguments; (4) the trial court erred in admitting evidence that codefendant Jerome Wilkins had pled guilty to the murder and in allowing the State to reference this evidence during its opening and closing arguments; (5) he received ineffective assistance of counsel when defense counsel made an erroneous remark during opening statements; (6) the trial court erred in failing to appoint new counsel for him following a *Krankel* hearing; and (7) the trial court improperly imposed a 30-year consecutive sentence. For the following reasons, we affirm the judgment of the circuit court of Cook County.

¶ 2                                    BACKGROUND

¶ 3    On September 8, 1991, the defendant and codefendant Jerome Wilkins (codefendant Wilkins) shot and killed the victim, Willis Myers (Myers), at 502 East Browning Avenue in Chicago, Illinois. Codefendant Wilkins was arrested for Myers' murder and later pled guilty and served time in prison for the crime. However, the defendant could not be located and a warrant was issued for his arrest.

¶ 4    On February 21, 2007, the defendant was arrested for the shooting death of Myers, while he was serving a federal sentence on an unrelated charge in a Pennsylvania penitentiary. On March 22, 2007, the defendant was charged with two counts of first-degree murder.

¶ 5    On May 18, 2009, the State filed a motion to extend the speedy trial term (motion to

extend term), alleging that it had just located its material witness, Kenneth Jackson (Jackson), on that day in Racine County, Wisconsin. The State requested that an extension of time be allowed so that the necessary documents could be executed and served on Jackson to compel his appearance in court for trial. On May 26, 2009, the defendant filed a response to the State's motion to extend term, arguing that the State had failed to exercise due diligence in locating and securing the appearance of Jackson for trial. On May 27, 2009, following a hearing on the State's motion to extend term, the trial court found that the State had exercised due diligence in locating Jackson, without whom the State could not proceed in the prosecution of the defendant. The trial court then granted a 30-day extension of time beyond the speedy trial term.

¶ 6        On June 24, 2009, a jury trial began during which the State presented the testimony of several witnesses. During opening statements, the State asserted that the defendant and codefendant Wilkins shot and killed Myers for wearing his hat in a manner that was disrespectful to their street gang. The State stated that Jackson was an eyewitness to the crime and noted that codefendant Wilkins had pled guilty to the first-degree murder of Myers. Defense counsel[1] stated that Jackson and his then wife, Joizette Finley (Finley), were also arrested for the illegal possession of firearms in their home on the day the shooting. Defense counsel asserted that Jackson and Finley provided statements to the police about the shooting after they were arrested, and noted that the weapons charges against them were dropped after they testified against the defendant before a grand jury.

¶ 7        Following opening statements, a sidebar conference was held during which the State requested a mistrial. The State argued that there were "actual gasps from the jury" when defense counsel stated that Jackson's and Finley's weapons charges were dismissed after they testified against the defendant before a grand jury. The State claimed that while the misdemeanor weapons charges against Jackson and Finley were dismissed, they were actually replaced with felony weapons charges that resulted in a conviction. In response, defense counsel explained that his comment was made in good faith because the reinstatement of the felony weapons charges against Jackson and Finley was absent from the information sheet available to the defense. The trial court then denied the State's motion for a mistrial, but allowed the State to address the issue through trial testimony and to clarify it in closing arguments.

¶ 8        Medical Examiner Nancy Jones (Dr. Jones) performed the autopsy of the victim, Myers. She observed that Myers was shot three times–in the back of the head, back of his left upper arm, and the left forearm. Myers also suffered from brush-burn abrasions and injuries around his mouth, a laceration on the right side of his upper lip, and a laceration in the right side of the tongue–all of which were consistent with falling onto a pavement and being punched in the face. Dr. Jones testified that there was no evidence of close-range firing. She concluded to a reasonable degree of medical and scientific certainty that Myers died as a result of

---

[1]Tod Urban and Rachel Moran served as defense counsel at trial. For this court's convenience, we will address both attorneys interchangeably as "defense counsel" and with the generic pronoun of "he."

multiple gunshot wounds and the manner of death was homicide. The parties then stipulated that a fired bullet and a fired bullet fragment retrieved from Myers' body was a ".38 Special" from a class of ammunition that included revolvers and automatic weapons.

¶ 9        Zeudon Knox (Knox) testified that on September 8, 1991, he, Myers and a friend named Kendrick drove to the Ida B. Wells housing complex because Myers "wanted to go see somebody." Knox stated that Myers was affiliated with a street gang. Once they arrived, Myers entered the building while Knox and Kendrick waited in the car. As they waited, Knox observed a fistfight at the building and heard multiple gunshots. Knox testified that Myers was shot as he tried to run; however, he was unable to identify the shooters. Thereafter, Knox and Kendrick drove a short distance and notified a police officer, who then returned to the crime scene with them.

¶ 10        Jackson testified at trial that he was 42 years old, that he resided outside of Illinois, and that Finley was his wife at the time of the 1991 shooting. He stated that he had previously lived in an apartment with Finley in the housing complex located at 511 East Browning Avenue in Chicago. Jackson testified that he was affiliated with the Gangster Disciples street gang in 1991. On September 8, 1991, Jackson was arrested for the illegal possession of firearms, and he was subsequently convicted of the weapons charges and sentenced to two years of imprisonment. However, Jackson denied witnessing the shooting and denied seeing individuals with the nickname "Red" or "J" at the time of the shooting. Jackson further noted that he was not Mirandized by the police at the time of his arrest for the illegal possession of weapons and that he did not recall making any statements to the police regarding the shooting, and he denied testifying before a grand jury in September 1991. At that point at trial, the State confronted Jackson with prior inconsistent statements that he had made in his September 1991 grand jury testimony, and Jackson denied making those statements. Jackson further testified that he did not recall identifying the defendant in a photographic array during a home visit by two Chicago detectives in January 2006.

¶ 11        Finley testified at trial that in 1991, she was married to Jackson and that they resided in a third-floor apartment at the Ida B. Wells housing complex at 511 East Browning Avenue in Chicago. She noted that their apartment unit had a view of the front entry area of the building. Finley then identified a photograph of the defendant as an individual nicknamed "Red" and identified another individual as "J" in a second photograph presented by the State. Finley did not recall seeing either "Red" or "J" on September 8, 1991, and could not recall the details of the shooting because she suffered from memory loss resulting from an accident that occurred 15 years earlier. Finley also could not recall whether she spoke with the police about the shooting in 1991, nor could she remember testifying before a grand jury on the day after the shooting.

¶ 12        Sandra Provenzano (Provenzano) testified that on the day after the shooting, September 9, 1991, she served as a court reporter for a grand jury hearing during which Jackson and Finley testified. The State then introduced the grand jury transcripts of Jackson's and Finley's testimony into evidence and published it to the jury. In his grand jury testimony, Jackson stated that on September 8, 1991, he was in the bedroom of his apartment at 511 East Browning Avenue, when his wife Finley informed him that someone outside was calling his name. Jackson then looked out the window and observed the victim, Myers, run out of the

-4-

building while "Red" chased Myers with a gun in his hand. "Red" then shot Myers five to six times. Jackson also observed an individual named "J" run out of the building, slip and fall, and proceed to fire three to four gunshots at Myers. Jackson testified that he had known "Red" and "J" his entire life. In her grand jury testimony, Finley testified that on September 8, 1991, "Red" was selling a product to Myers, along with 10 other individuals, on the first floor of the building located at 511 East Browning Avenue. After Myers purchased the product, "Red" punched Myers in the face, after which Finley retreated to her apartment. Shortly thereafter, Finley believed she had heard someone call Jackson's name from outside the window. She testified that as Jackson went to the window, she heard about 12 gunshots. Subsequently, Finley joined Jackson at the window, where Jackson directed her attention to a body lying against a fence across the street. Finley noticed that the victim was Myers and observed "Red" and "J" flee the scene. Finley further testified that "J" was someone whose first name was "Jerome." Later that day, Finley overheard "Red" tell an unknown individual that Myers was shot because they believed that Myers was a member of a rival gang.

¶ 13      Codefendant Wilkins testified on behalf of the State that he was an inmate in the Cook County department of corrections for a pending but unrelated case. He noted that in March 1995, he pled guilty to the first-degree murder of Myers and had served his sentence for that case. Codefendant Wilkins denied knowing the defendant as "Red" and stated that the defendant's nickname was "Cool." He claimed that he met the defendant for the first time in Iowa in 1993. Codefendant Wilkins stated that he lived in the Ida B. Wells housing complex from his birth in 1977 until 1995, that he was a member of the Gangster Disciples street gang, and that his nickname was "J." He testified that on September 8, 1991, he was selling drugs with several other individuals in the lobby of the building located at 511 East Browning Avenue. He stated that he shot Myers because Myers "snatched [his] drugs." Codefendant Wilkins denied that the defendant was present at the time of the shooting and denied making a statement to the police and to an assistant State's Attorney. Although he acknowledged that his signature and his mother's name[2] was on a handwritten statement detailing the shooting, he testified that he signed the statement under police coercion.

¶ 14      Former Assistant State's Attorney Nick Arvanitis (ASA Arvanitis) testified that he was an assistant State's Attorney in 1991. On September 9, 1991, at approximately 5 a.m., he spoke with codefendant Wilkins during which Detective Tom Kelly, a youth officer and codefendant Wilkins' mother were also present. After advising codefendant Wilkins of his *Miranda* rights, codefendant Wilkins made a statement to ASA Arvanitis regarding the shooting. Codefendant Wilkins then conferred with his mother and signed a handwritten statement summarizing the details of the shooting. The handwritten statement was then published to the jury at trial as follows: On September 8, 1991, codefendant Wilkins and several friends were in the lobby of a building located at 511 East Browning Avenue in Chicago. Codefendant Wilkins had a .38-caliber handgun hidden in a radiator and "Red" also had a firearm. While codefendant Wilkins and "Red" were selling drugs, "[Myers] came into

---

[2]Codefendant Wilkins' mothers name appeared on the handwritten statement because he was a minor at the time of the 1991 shooting.

the building wearing his hat tilted to the left," which codefendant Wilkins interpreted to mean that he was a "hook"–a member of the rival gang, Vice Lord. Codefendant Wilkins' friend, Rodney, told Myers to "straighten up his hat," but Myers refused and instead stated that he just wanted to "get high." Myers purchased $10 of cocaine. When asked again to adjust his hat, Myers refused, after which an individual named Calvin began to punch Myers. Codefendant Wilkins and "Red" then chased Myers while armed with their firearms. "Red" then shot him about six times. Although codefendant Wilkins slipped and fell during the chase, he managed to fire about six gunshots at Myers. After the shooting, "Red" and codefendant Wilkins fled the scene and codefendant Wilkins went to a friend's apartment. Codefedant Wilkins indicated that he had the opportunity to confer with his mother before memorializing his statement in writing.

¶ 15 Detective Tom Kelly (Detective Kelly) testified that on September 8, 1991, he was assigned to investigate Myers' murder at 502 East Browning Avenue in Chicago. In the course of his investigation, Detective Kelly spoke with Jackson and Finley–whose accounts of the shooting were similar to the testimony they gave at the grand jury hearing. Detective Kelly was aware that Jackson was under arrest on weapons charges at that time, but he made no promises to Jackson in exchange for his eyewitness statement. Similarly, Detective Kelly stated that he made no promises to Finley in exchange for her account of the shooting. Detective Kelly noted that he was present at the police station at the time codefendant Wilkins signed the written statement prepared by ASA Arvanitis. Detective Kelly later learned that the names "James Jones" and "Red" were aliases for the defendant. Detective Kelly testified that a warrant was issued for the defendant's arrest because the police were unable to locate him.

¶ 16 Detective Robert Trlak (Detective Trlak) testified that from 1991 to 1999, the police made unsuccessful attempts to locate the defendant. However, in July 1999, he received information from a source that the names of "Charles Collins" and "Charles Davis" were aliases for the defendant. Detective Trlak was then able to obtain a photograph of "Charles Davis." At that time at trial, the parties stipulated that a photograph of "Charles Davis," which Detective Trlak had obtained during the course of his investigation, was in fact a photograph of the defendant. Detective Trlak stated that after he obtained the photograph of the defendant, he was unable to locate Jackson and Finley in order to see if they could identify the individual in the photograph as "Red." Thereafter, the case was temporarily put aside. On January 12, 2006, Detective Trlak and his partner, Detective Robert Lenihan (Detective Lenihan), traveled to Racine, Wisconsin, where they located Jackson at his residence. Detectives Trlak and Lenihan presented Jackson with a photographic array from which Jackson positively identified the defendant's photograph by saying "[t]hat's Red that used to hang out at Browning." Jackson then informed Detective Trlak that "Red" was involved in the 1991 shooting. Subsequently, Jackson and Detectives Trlak and Lenihan signed and dated the defendant's photograph. Detective Trlak testified that the police could not locate Finley in 2006.

¶ 17 Detective Lenihan testified that on September 21, 2006, he and Detective Michael Cummings (Detective Cummings) continued to investigate the 1991 shooting. On September 21, 2006, Detective Lenihan, Detective Cummings, and ASA Heather Alwin (ASA Alwin)

traveled to the Lewisburg Penitentiary in Pennsylvania where the defendant was serving a federal sentence on an unrelated crime. Detectives Lenihan and Cummings did not place the defendant under arrest at that time, but advised him of his constitutional rights. The defendant then told the detectives that he was not surprised to see them, that he was present when codefendant Wilkins was arrested in 1991, and that codefendant Wilkins was not going to testify against him. However, the defendant informed the detectives and ASA Alwin that "he was young when [the shooting] happened, [t]hat he thought about giving a statement, but [that] he wanted to talk to his family first." The defendant also acknowledged to the detectives and ASA Alwin that his former nickname was "Red," but that his current nickname was "Cool."

¶ 18    The parties then stipulated at trial that on September 8, 1991, Jackson was arrested for misdemeanor "possession of guns" and that Finley was also arrested for "misdemeanor unauthorized possession or storage of a weapon." The parties stipulated that both Jackson's and Finley's charges were later "stricken with leave to reinstate," but that they were not stricken in exchange for any statements or testimony Jackson gave to the police or grand jury. The parties further stipulated that on September 18, 1991, Jackson's charges were "superseded by indictment" and upgraded to "felony possession" of the weapons. A sidebar conference was then held during which defense counsel admitted that he had misread the stipulation and that he could not agree to the portion of the stipulation stating that no promises were made to Jackson in exchange for dismissing his misdemeanor charges. Following the sidebar conference, the trial court informed the jury that a typographical error had been made, and the State reread the stipulations to the jury by omitting the portion to which defense counsel objected. Instead, the parties stipulated that former ASA George Andrews, if called to testify, would testify that he was assigned to Jackson's gun possession case and that Jackson's misdemeanor charges were not dismissed in exchange for any statements or testimony that Jackson gave to the police or to the grand jury. The parties also stipulated that Jackson pled guilty to the felony weapons charges and served two years in prison. The trial court then admitted into evidence, without any objections, a certified record of Jackson's misdemeanor charges and a certified copy of conviction for Jackson's felony charges. The State then rested.

¶ 19    Defense counsel then introduced into evidence a "certified statement of deposition" in the case of People v. Finley, marked as case number 91138130901. The defense then rested.

¶ 20    During closing arguments, the State apprised the jury on Illinois law pertaining to prior inconsistent statements. The State argued that "people might speak the truth right after something happens," but that they may change their testimony at trial. The State stated that the "law recognizes it" and that the jury could consider the prior inconsistent statements of Jackson, Finley and codefendant Wilkins "as if that is what they said in court before you." Following deliberations, the jury found the defendant guilty of first-degree murder.

¶ 21    On July 30, 2009, the defendant filed a motion for a new trial. On August 18, 2009, at a hearing on the motion for a new trial and sentencing, the defendant alleged ineffective assistance of counsel and requested a *Krankel* hearing, which the trial court granted. On October 15, 2009, the defendant filed a *pro se* "motion for a new trial/dismiss attorney," alleging ineffective assistance of counsel by asserting, *inter alia*, that defense counsel failed

to call key witnesses to testify on his behalf at trial.

¶ 22 On December 16, 2009, following a *Krankel* hearing, the trial court denied the defendant's request to appoint new counsel. The trial court allowed the July 30, 2009 motion for a new trial to be supplemented with the defendant's *pro se* October 15, 2009 "motion for a new trial/dismiss attorney." The trial court then denied the defendant's motion for a new trial. On that same day, December 16, 2009, the trial court sentenced the defendant to 30 years in prison, to be served consecutively with his federal sentence on an unrelated conviction.

¶ 23 On January 14, 2010, the trial court denied the defendant's motion to reconsider sentence. On January 19, 2010, the defendant filed a notice of appeal before this court.

¶ 24                                                          ANALYSIS

¶ 25 We determine the following issues: (1) whether the trial court erred in granting the State a 30-day extension of time beyond the speedy trial term; (2) whether the defendant received ineffective assistance of counsel when defense counsel made an erroneous remark during opening statements; (3) whether the trial court erred in admitting evidence of the defendant's postarrest silence; (4) whether the State misstated the law and improperly bolstered the credibility of the witnesses' prior inconsistent statements during closing arguments; (5) whether the trial court erred in admitting evidence that codefendant Wilkins had pled guilty to the murder and in allowing the State to reference this evidence during its opening and closing arguments; (6) whether the trial court erred in failing to appoint new counsel for him following a *Krankel* hearing; and (7) whether the trial court improperly imposed a 30-year consecutive sentence.

¶ 26 We first determine whether the trial court erred in granting the State a 30-day extension of time beyond the speedy trial term.

¶ 27 The defendant argues that the trial court violated his statutory right to a speedy trial when it granted the State a 30-day extension of time beyond the 120-day speedy trial term where the State failed to exercise due diligence in locating Jackson as a witness. Specifically, he contends that the State took little to no substantive action to locate Jackson until shortly prior to the expiration of the speedy trial term, and that the State should have begun its search for Jackson in Racine, Wisconsin, where Detectives Trlak and Lenihan had visited him in 2006. He further argues that because the trial court improperly granted the 30-day extension and he was not tried within the statutory speedy trial term, the first-degree murder charges against him should be dismissed. The defendant acknowledges his failure to properly preserve this issue for review on appeal, but nonetheless argues that this court may consider the merits of his arguments under the plain error doctrine.

¶ 28 The State counters that the defendant has forfeited this issue for review on appeal because the defendant had failed to include the issue in his motion for a new trial. Moreover, the State maintains that this court should not review the merits of the defendant's arguments because he failed to specifically allege *how* the plain error doctrine applies in this case. Even if this court addresses the defendant's arguments, the State contends, no error occurred because the record positively establishes that the State engaged in due diligence in locating

-8-

Jackson prior to trial.

¶ 29    Initially, we find that the defendant has forfeited this issue for review on appeal because although defense counsel objected to the State's request to extend the speedy trial term during pretrial proceedings, he failed to preserve the issue in the motion for a new trial. *People v. Herron*, 215 Ill. 2d 167, 175, 830 N.E.2d 467, 472-73 (2005) (a defendant who fails to either make a timely trial objection and include the issue in a posttrial motion forfeits the review of the issue). However, despite the defendant's failure to include this issue in the motion for a new trial, it is subject to plain error review because a speedy trial implicates fundamental constitutional concerns. *People v. Gay*, 376 Ill. App. 3d 796, 799, 878 N.E.2d 805, 808 (2007) (defendant's forfeited claim is reviewed under the plain error doctrine because "a speedy trial is a substantial, fundamental right"). Therefore, we proceed to the merits of this issue.

¶ 30    Section 103-5 of the Code of Criminal Procedure of 1963 (Code), commonly known as the Speedy Trial Act (Act), provides in relevant part that "[e]very person in custody in this State for an alleged offense shall be tried by the court having jurisdiction within 120 days from the date he was taken into custody unless delay is occasioned by the defendant." 725 ILCS 5/103-5(a) (West 2008); see also U.S. Const., amends VI, XIV; Ill. Const. 1970, art. I, § 8 (an accused has a constitutional right to a speedy trial). "Delay shall be considered to be agreed to by the defendant unless he *** objects to the delay by making a written demand for trial or an oral demand for trial on the record." 725 ILCS 5/103-5(a) (West 2008). A trial court may continue the cause up to an additional 60 days if it "determines that the State has exercised without success due diligence to obtain evidence material to the case and that there are reasonable grounds to believe that such evidence may be obtained at a later day." 735 ILCS 5/103-5(c) (West 2008). "The test of due diligence is whether the State began efforts to locate its witness in sufficient time to secure [his] presence before the speedy trial term expired." *People v. Exson*, 384 Ill. App. 3d 794, 799, 896 N.E.2d 844, 849 (2008). A trial court's decision to grant an extension under the Act will not be disturbed on appeal absent an abuse of discretion. *People v. Gray*, 326 Ill. App. 3d 906, 909-10, 761 N.E.2d 1237, 1240 (2001).

¶ 31    In the instant case, the record indicates that on February 21, 2007, the defendant was arrested for Myers' murder. On March 22, 2007, the defendant was charged with two counts of first-degree murder. On May 18, 2009, the State filed a motion to extend term, requesting that an extension of time be allowed so that the necessary documents could be executed and served on Jackson to compel his appearance for trial. On May 27, 2009, at the hearing on the State's motion to extend term, the trial court found that the State had exercised due diligence in locating Jackson, without whom the State could not proceed in the prosecution of the defendant. The trial court then granted a 30-day extension of time beyond the June 1, 2009[3] expiration of the speedy trial term.

¶ 32    We find that the trial court did not abuse its discretion in granting the State a 30-day extension of time beyond the speedy trial term. The record shows that in September 2008,

---

[3]The parties did not dispute that the speedy trial term expired on June 1, 2009.

-9-

three months before this case was originally set for jury trial on December 2, 2008, the State began its investigation into Jackson's whereabouts. Thereafter, the State received information that Jackson might be residing in Hennepin County, Minnesota. On November 20, 2008, the State obtained a "certificate of judge adjudicating [Jackson] a material witness" and a subpoena, which were delivered to the authorities in Hennepin County. The Hennepin County authorities then assigned local investigators to locate Jackson. On December 2, 2008, defense counsel was unable to appear in court due to a family emergency. The parties then agreed to set January 13, 2009 as the jury trial date. The record shows that from November 2008 to May 2009, the State was repeatedly assured by the Hennepin County authorities that Jackson resided at a specific address in Hennepin County, but that they were unable to locate him because they believed Jackson was avoiding service of the subpoena. As a result, the State was not ready for trial on January 13, 2009, and the case was continued to March 23, 2009. The record shows that between March 23, 2009 and May 18, 2009, the defendant made six jury trial demands on the record. However, during that time, the State continued to be in contact with Hennepin County authorities. On May 13, 2009, the State's prosecutors and investigators traveled to Hennepin County for two days, during which they discovered that Jackson might actually be residing in Racine, Wisconsin. The State then contacted Wisconsin authorities, who located Jackson but improperly served him with an Illinois subpoena. On May 18, 2009, Jackson telephoned the State's investigators and an assistant State's Attorney to inform them that he refused to be a witness at trial. On that same day, May 18, 2009, the State filed a motion to extend term. Subsequently, the State procured the necessary paperwork to obtain a Wisconsin subpoena to serve on Jackson. Although the defendant argues that the State should have begun its search for Jackson in Wisconsin, where the police had questioned him in 2006, rather than in Minnesota, such evidence was never presented to the trial court at the May 27, 2009 hearing. Thus, based on the totality of the evidence in the record, we find that the trial court acted within its discretion in finding that the State was duly diligent in its efforts to locate Jackson prior to the expiration of the speedy trial term on June 1, 2009, and in granting a 30-day extension of time for the State to execute the necessary paperwork in Wisconsin to secure Jackson's appearance for trial in Illinois.

¶ 33 We next determine whether the defendant received ineffective assistance of counsel when defense counsel made an erroneous remark during opening statements.

¶ 34 The defendant contends that he was deprived of his right to have effective counsel when defense counsel erroneously stated during opening statements that the weapons charges against Jackson and Finley were dropped after they testified against the defendant before a grand jury. This erroneous statement, he maintains, allowed the State the opportunity to repeatedly discredit the defense and created the perception that the defense was trying to mislead the jury.

¶ 35 The State argues that defense counsel's single statement during opening statement did not constitute overall deficient representation and that there was no possibility that it could have altered the outcome of the trial. The State further maintains that the jury was instructed by the trial court that arguments by attorneys could not be considered evidence, and that the defense counsel was not personally discredited at trial.

¶ 36 To prevail on a claim of ineffective assistance of counsel, the defendant: (1) must prove

that the attorney's performance fell below an objective standard of reasonableness so as to deprive him of the right to counsel under the sixth amendment (performance prong); and (2) that this substandard performance resulted in prejudice (prejudice prong). *Strickland v. Washington*, 466 U.S. 668, 687-94 (1984). To prove prejudice, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (Internal quotation marks omitted.) *People v. King*, 316 Ill. App. 3d 901, 913, 738 N.E.2d 556, 566 (2000). A reasonable probability is one that sufficiently undermines confidence in the outcome. *Id.* The defendant must satisfy both prongs to prevail on his claim of ineffective assistance of counsel. However, a reviewing court may analyze the facts of the case under either prong first, and, if it deems that the standard for that prong is not satisfied, it need not consider the other prong. *People v. Irvine*, 379 Ill. App. 3d 116, 129-30, 882 N.E.2d 1124, 1136-37 (2008).

¶ 37    In the case at bar, defense counsel stated in opening statements that the weapons charges against Jackson and Finley were dropped after they testified against the defendant before a grand jury. Following opening statements, a sidebar was held during which the State requested a mistrial and claimed that the misdemeanor weapons charges were dismissed but then upgraded to felony weapons charges. In response, defense counsel explained that his comment was made in good faith because the reinstatement of the felony weapons charges against Jackson and Finley was absent from the information sheet available to the defense. The trial court then denied the State's motion for a mistrial, but allowed the State to address the issue through trial testimony and to clarify it in closing arguments. Thereafter, the State elicited witness testimony from Jackson and Officer Kelly that Jackson was convicted of the felony weapons charges and sentenced to two years of imprisonment, and that no promises were made to Jackson in exchange for his eyewitness testimony. The parties also stipulated at the close of witness testimony that Jackson's misdemeanor weapons charges were upgraded to felony weapons charges, and the State introduced into evidence a certified copy of conviction for Jackson's felony weapons charges. The State further alluded to this evidence during closing arguments.

¶ 38    We find that the defendant cannot show that there was a reasonable probability that the outcome of the trial would have been different but for defense counsel's single erroneous statement at issue. The 1991 grand jury transcripts of Jackson's and Finley's testimony were introduced into evidence and published to the jury. Jackson testified in the 1991 grand jury hearing that he had known "Red" and "J" his entire life and that on September 8, 1991, he observed "Red" chase Myers with a gun in his hand and shoot Myers five to six times. He also observed that "J" fired three to four shots at Myers. The jury also heard Finley's grand jury testimony that she saw "Red" punch Myers in the face shortly before the shooting occurred and that she observed "Red" and "J" flee the scene after the murder. The jury also heard ASA Arvanitis's testimony that codefendant Wilkins signed a handwritten statement summarizing the details of the 1991 shooting. ASA Arvanitis stated that in codefendant Wilkins' handwritten statement, he indicated that he and "Red" shot Myers multiple times and then fled the scene. Detective Trlak also testified at trial that on January 12, 2006, he and Detective Lenihan located Jackson in Racine, Wisconsin, where Jackson positively identified the defendant as "Red" in a photographic array and informed them that "Red" was involved

in the 1991 shooting. It is well settled that a witness's recanted testimony admitted pursuant to section 115-10.1 of the Code may be sufficient to prove a defendant's guilty murder beyond a reasonable doubt. *People v. Craig* 334 Ill. App. 3d 426, 438, 778 N.E.2d 192, 202 (2002); *People v. Morrow*, 303 Ill. App. 3d 671, 676-77, 708 N.E.2d 430, 436 (1999). Based on the evidence presented at trial, we cannot say that there was a reasonable probability that the defendant would not have been convicted of first-degree murder but for defense counsel's erroneous remark during opening statements. Therefore, we find that the defendant's claim for ineffective assistance of counsel must fail.

¶ 39   The defendant also raises several issues which he acknowledges are forfeited on appeal because defense counsel neither objected at trial nor presented them in the defendant's motion for a new trial. *Herron*, 215 Ill. 2d at 175, 830 N.E.2d at 472-73. Specifically, he contends that the trial court erred in admitting evidence of his postarrest silence; that the State misstated the law and improperly bolstered the credibility of the witnesses' prior inconsistent statements during closing arguments; and that the trial court erred in admitting evidence that codefendant Wilkins had pled guilty to the murder and in allowing the State to reference this evidence during its opening and closing arguments. The plain error doctrine allows a reviewing court to consider unpreserved issues when either: (1) the evidence is close, regardless of the seriousness of the error; or (2) the error is so serious, regardless of the closeness of the evidence. *Id.* at 178-79, 830 N.E.2d at 475; *People v. Piatkowski*, 225 Ill. 2d 551, 565, 870 N.E.2d 403, 410-11 (2007).

¶ 40   Our supreme court has recently held that "the closely-balanced-evidence-prong of plain error is similar to an analysis for ineffective assistance of counsel based on evidentiary error insofar as a defendant in either case must show he was prejudiced," stating that both analyses are "evidence-dependent and result-oriented." *People v. White*, 2011 IL 109689, ¶¶ 133-34. The *White* court found that even assuming that an error occurred in the admission of the challenged evidence, the evidence in the record against the defendant was "such that he [could not] show prejudice for purposes of either analysis." *Id.* at ¶ 134. Applying the principle pronounced in *White* to the facts of the instant case, we find that having determined that the defendant has failed to establish prejudice under the *Strickland* analysis, as discussed, we likewise find that the defendant cannot establish prejudice under the plain error analysis. Even assuming, *arguendo*, that error occurred in the admission of the complained-of evidence and the State's closing arguments, the evidence against the defendant is such that he cannot show prejudice–namely, that the verdict may have resulted from the alleged errors rather than from the evidence at trial. Accordingly, we need not further address the defendant's forfeited issues.

¶ 41   We next determine whether the trial court erred in failing to appoint new counsel for him following a *Krankel* hearing.

¶ 42   The defendant argues that the trial court should have appointed new counsel for him because defense counsel was ineffective for failing to call three key witnesses at trial–his mother, Russ Ewing (Ewing) and Sidney Jones (Jones). He contends that if called to testify, his mother and Ewing would have testified that they escorted the defendant to the police station after the shooting "to clear his name," which would have countered the State's argument at trial that the defendant eluded the police after the crime occurred. He further

argues that defense counsel should have called Jones to testify as an alibi witness, as he would have testified that he was with the defendant on the day of the shooting. The State counters that the trial court properly declined to appoint new counsel following a full *Krankel* inquiry into the defendant's allegations.

¶ 43    In *Krankel*, our supreme court addressed the issue of how a defendant's *pro se* posttrial motion alleging ineffective assistance of counsel must be addressed by a trial court. *People v. Krankel*, 102 Ill. 2d 181, 464 N.E.2d 1045 (1984). "New counsel is not automatically required in every case where a defendant brings such a motion." *People v. Taylor*, 237 Ill. 2d 68, 75, 927 N.E.2d 1172, 1175 (2010). Rather, the trial court should first examine the factual basis of the defendant's claim. *Id.* "If the court determines the claim lacks merit or pertains only to matters of trial strategy, new counsel need not be appointed and the *pro se* motion may be denied." *Id.* at 75, 927 N.E.2d at 1175-76. However, new counsel should be appointed by the trial court to argue the defendant's claim of ineffective assistance if the defendant's allegations show possible neglect of the case. *Id.* at 75, 927 N.E.2d at 1176.

¶ 44    In the case at bar, on August 18, 2009, the defendant alleged ineffective assistance of counsel and requested a *Krankel* hearing, which the trial court granted. On October 15, 2009, the defendant filed a *pro se* "motion for a new trial/dismiss attorney," alleging ineffective assistance by asserting, *inter alia*, that defense counsel failed to call certain key witnesses to testify on his behalf at trial. On December 16, 2009, a *Krankel* hearing was held during which the defendant argued that defense counsel failed to call as witnesses his mother and Ewing, who was a news reporter at the time, to testify that they personally escorted him to the police station after the 1991 shooting to "clear [his] name," but that, when they arrived, police officers informed them that there was no warrant for the defendant's arrest. The defendant asserted that this evidence would have countered defense counsel's closing arguments at trial that the defendant had fled from justice because he was "scared and had a lack of education." The defendant maintained that he never gave defense counsel permission to make that statement in closing arguments. The trial court then provided defense counsel with an opportunity to respond. Defense counsel responded that "[t]his is news to [the defense team]," and that he had no knowledge of this information.

¶ 45    The trial court then ruled that defense counsel's failure to mention the fact that the defendant, his mother, and Ewing may have gone to the police station after the shooting was not "indicative of facts or circumstances that would support an ineffectiveness of counsel claim" but, rather, was trial strategy. The trial court further noted that there were also "limitations made by this court as to what could be presented with regard to [the defendant's] arrest because we didn't want to prejudice the jury by letting them know [he was] in federal custody on another case, so there were other strategy reasons and reasons to protect [him] that would have excluded some of that being mentioned."

¶ 46    The defendant also asserted that defense counsel was ineffective for failing to call an alibi witness, Jones, who would have testified at trial that Jones was with the defendant at the time of the shooting. In response, defense counsel noted that he was unaware of any alibi witnesses in this case. The State also noted that there was no evidence that the defendant had made any alibi statements to the police that could have been further explored by defense counsel at trial. The trial court then found that Jones's testimony would not have been

-13-

considered an alibi, that there was no alibi for defense counsel to present at trial, and that all matters were trial strategy.

¶ 47        Based on our review of the record, we find that the trial court conducted an adequate inquiry into the defendant's *pro se* allegations of ineffective assistance of counsel. The record demonstrates that the trial court adequately inquired and reviewed each of the defendant's allegations, that it gave the defendant an opportunity to argue, explain and support each allegation, and that it gave defense counsel an opportunity to respond to the defendant's allegations. Here, defense counsel was unaware of information pertaining to the defendant's mother, Ewing and Jones. Although defense counsel's lack of awareness was not *per se* "trial strategy," the trial court did not err in finding no "possible neglect" of the case by defense counsel, where the ineffective assistance of counsel claim lacked merit. As the record demonstrates, the trial court found that the failure to call the defendant's mother and Ewing to testify was not "indicative of facts or circumstances that would support an ineffectiveness of counsel claim," because such evidence would have been excluded as a result of the limitations imposed by the trial court regarding what could be presented at trial pertaining to the defendant's arrest. Further, the defendant's allegation that defense counsel was ineffective for failing to call Jones as an alibi witness was without merit, where there was no indication in the record that the defendant ever apprised defense counsel of the existence of Jones. Thus, defense counsel could not have been ineffective for failing to call an alleged witness of whom he had no knowledge. Therefore, we find that the defendant's claim of ineffective assistance of counsel lacked merit and the trial court properly denied the defendant's request to appoint new counsel.

¶ 48        Finally, we determine whether the trial court improperly imposed a 30-year consecutive sentence, which we review on an abuse of discretion standard. See *People v. Gutierrez*, 402 Ill. App. 3d 866, 900, 932 N.E.2d 139, 171 (2010).

¶ 49        The defendant contends that the trial court abused its discretion in imposing a 30-year sentence to be served consecutively to his federal sentence on an unrelated case. Specifically, the defendant argues that the trial court's imposition of a consecutive sentence was based upon exaggerated and untrue facts–such as characterizing Myers' murder as an "execution" and stating that the defendant went on a "crime spree" that included violent crimes subsequent to the 1991 shooting. Accordingly, he urges this court to reduce his sentence or to vacate his sentence and remand the matter for resentencing. The State argues to the contrary that the defendant's sentence was proper and that the defendant has forfeited this issue on appeal.

¶ 50        Sentencing decisions of the trial court are entitled to great deference because the trial court, based on its firsthand consideration of the defendant's credibility, demeanor, moral character and other relevant factors, is in a better position than a reviewing court to impose the appropriate sentence. *Id.* Accordingly, "a trial court has wide latitude in determining and weighing factors in mitigation or aggravation in imposing a sentence." *Id.* An imposed sentence which falls within the statutory guidelines will not be disturbed absent an abuse of discretion. *Id.* Moreover, a reviewing court will not reweigh the sentencing factors; instead, the trial court is presumed to have considered all mitigating evidence before it, absent any indication in the record to the contrary. *Id.*

¶ 51    We find that the defendant has properly preserved this issue for review because it was included in his motion to reconsider sentence. See *People v. Snowden*, 2011 IL App (1st) 092117, ¶ 85 ("[t]o preserve a sentencing issue for appellate review, a defendant must raise the issue with the trial court in a postsentencing motion"). Accordingly, we address the merits of the defendant's arguments.

¶ 52    Based on our review of the record, we find that the trial court acted within its discretion in imposing a 30-year sentence to be served consecutively to the defendant's unrelated federal sentence. During the sentencing hearing, the trial court heard factors in aggravation and mitigation, and noted that it had reviewed the defendant's pre-sentence investigation. In determining the appropriate sentence, the trial court stated that after the 1991 shooting, the defendant engaged in a "life of crime, very serious crime, including violent crime." The trial court noted that such "crime spree" was an important factor in determining whether the defendant's sentence should be served consecutively with his federal sentence in order "to protect the public from further danger." The trial court stated that the evidence in this case demonstrated that there was an "execution." On appeal, the defendant challenges the accuracy of the quoted language above, arguing that the imposition of a consecutive sentence by the trial court was erroneously based upon these exaggerated and untrue facts. We find that the trial court did not abuse its discretion in imposing a 30-year sentence, which falls within the statutory sentencing range for first-degree murder. See 730 ILCS 5/5-8-1(a)(1)(a) (West 2008) (the statutory sentencing range for first-degree murder is between 20 and 60 years of imprisonment). Nor do we find any abuse of discretion in imposing the 30-year sentence to be served consecutively with the defendant's federal sentence, where the trial court found it necessary to protect the public from further danger. See 730 ILCS 5/5-8-4(a), (b) (West 2008) (trial court has discretion to impose consecutive sentences where a defendant is already subject to another sentence imposed by a federal court; consecutive sentences may be imposed where the trial court is of the opinion that they are required to "protect the public from further criminal conduct by the defendant"). Although the defendant correctly argues that the evidence does not support the trial court's statement that Myers was "shot when he was laying [*sic*] on the ground, begging for mercy," we find that an inference could be made that an "execution" occurred, based on Dr. Jones's testimony that Myers suffered multiple gunshot wounds to the back of his head and arms. Likewise, although the defendant challenges the trial court's characterization of his criminal background as "violent," we find no error in such description in light of the fact that the trial court heard aggravating factors of the defendant's subsequent convictions involving guns and drugs. Thus, we find no abuse of discretion in the trial court's imposition of a 30-year sentence to be served consecutively with the federal sentence.

¶ 53    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 54    Affirmed.