# Illinois Official Reports

## Appellate Court

---

### *People v. Tatum*, 2019 IL App (1st) 162403

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. SYLVESTER TATUM, Defendant-Appellant. |
| District & No. | First District, Third Division<br>No. 1-16-2403 |
| Filed<br>Rehearing denied | August 7, 2019<br>October 7, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 13-CR-3551; the Hon. Thomas V. Gainer Jr., Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, Patricia Mysza, and Sarah Curry, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, John E. Nowak, and Mari R. Hatzenbuehler, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE ELLIS delivered the judgment of the court, with opinion.<br>Presiding Justice Fitzgerald Smith and Justice Howse concurred in the judgment and opinion. |

**OPINION**

¶ 1     Defendant Sylvester Tatum was jumped and beaten on a street corner. By all accounts, he was furious that his best friend, Levi Stubblefield, stood by during the beating and let him fend for himself. Moments later, the two friends went inside defendant's apartment building, where several gunshots were soon fired. Stubblefield's body was found in a vacant apartment on the first floor where defendant, Stubblefield, and others from the neighborhood often hung out. The State's theory at trial was that defendant, feeling abandoned and betrayed, killed Stubblefield in a fit of rage. The jury agreed and found defendant guilty of first degree murder.

¶ 2     On appeal, defendant argues that the evidence was insufficient to sustain his conviction, that his right to a speedy trial was violated, that the State impermissibly bolstered the credibility of two key witnesses with their prior consistent statements, and that the trial court abused its discretion when it allowed the jury to view graphic autopsy photos that had little or no probative value. We affirm.

¶ 3                                    BACKGROUND
¶ 4                                         I
¶ 5     By November 4, 2011, Stubblefield's mother, Arbrett, and his sister, Latoya, had grown concerned. They had neither seen nor heard from Stubblefield for at least a couple of days, which was unusual. Latoya spoke to the police, who told her to find the last person to be seen with her brother. Latoya went to see defendant, a close friend of the family since childhood. Defendant told Latoya that he had not seen Stubblefield. He also said that he was beaten up two days earlier, on November 2, and that Stubblefield did not come to his aid during the fight. Defendant and Latoya filed a missing persons report together.

¶ 6     The next day, Arbrett, Latoya, and Latoya's husband, Lamont, went to defendant's home, a first-floor apartment at 320 North Pine Street in Chicago. Latoya asked defendant to help them look for Stubblefield in the building. Defendant directed them to an apartment on the second floor, but Latoya wanted to check the vacant apartment on the first floor, which she knew to be a hangout spot that her brother frequented. (To be precise, the building is 320-322 North Pine Street; it has two front entrances, one corresponding to each address. The vacant apartment is on the 320 side; defendant's apartment is on the 322 side. But other than Detective Mike Mancuso, the witnesses referred to the building as 320 North Pine, without any further distinction.)

¶ 7     Stubblefield's family and defendant went to the vacant apartment. The door was locked, and defendant did not let them in. Through the front window, Arbrett and Latoya saw shell casings on the floor. Arbrett then saw the lower half of her son's body. The family called the police, and after a forced entry, Stubblefield's dead body was found just inside the front door. He had numerous gunshot wounds.

¶ 8     Late in 2012, about a year after Stubblefield's murder, the police issued an investigative alert for defendant. He was arrested in January 2013 and soon indicted for this offense.

¶ 9     The evidence implicating defendant came from three principal occurrence witnesses—Christopher Randolph, Tyisha Hillard, and Al Thompson—who testified for the State. These witnesses all knew defendant and Stubblefield and considered them friends. And they all had prior convictions. (Mostly, but not exclusively, drug cases.) At the time of trial, Randolph was

on parole from his most recent conviction, Thompson had a pending UUWF charge, and Hillard was on probation for escape on an underlying drug case. Hillard also had a pending case for contempt, having failed to obey a witness subpoena issued by the trial court in this case. She frankly acknowledged that she did not want to testify. Thompson was equally clear that he only begrudgingly talked to the police.

¶ 10                                                    II

¶ 11       Randolph testified that on November 2, 2011, he was hanging out in front of a small retail strip near the intersection of Central Avenue and Lake Street. Defendant and Stubblefield were both there. Four or five guys from the neighborhood, all in their teens or twenties, arrived. They were all relatives—a son and some nephews—of one "Robert K." Randolph. The other witnesses all agreed that it was "fair to describe" Robert K. as a "dangerous man," "off the west side," who was "involved in not so legal activities" and who was no friend to either defendant or Stubblefield. But the witnesses were reluctant to say more than that. Randolph, in particular, denied knowing whether that retail strip was Robert K.'s drug turf.

¶ 12       Robert K.'s relatives unleashed a "straight whooping" on defendant. They fought with him and "jumped up and down on" him for several minutes, while defendant struggled in vain to defend himself. They did not attack Stubblefield, who "was sitting off to the side" and did not try to help defendant during the beating.

¶ 13       After the beating, defendant, Stubblefield, and Randolph all left the retail strip. Robert K.'s relatives stayed there. Defendant walked back to his apartment building on Pine Street, a block east of Central Avenue. Stubblefield followed, walking right behind him. Randolph, who lived across the street from defendant, headed back the same way. But he kept his distance, on the opposite side of the street, because he wasn't sure if the fighting would continue—and because "there is known to be shooting around there," particularly in the aftermath of a fight.

¶ 14       On the walk back, defendant was visibly mad at Stubblefield, and the two got into a "heated argument." On direct examination, Randolph testified that he couldn't hear what they were arguing about. On cross-examination, Randolph acknowledged that he had told the grand jury otherwise: Defendant and Stubblefield met up or "reconvene[d]" after the beating and had a "heated argument or verbal confrontation *** concerning why [Stubblefield] didn't help [defendant]." (After tiptoeing into some further areas of Randolph's grand jury testimony, including the apparent motive for the beating, defense counsel withdrew those questions, and the trial court instructed the jury to disregard them. But as we read the record, the question about the argument between Stubblefield and defendant stood.)

¶ 15       Defendant and Stubblefield went inside defendant's apartment building, through one of the front entrances on Pine Street. (Randolph did not say which one.) Randolph saw them from the gangway of his building, directly across the street, where he was smoking a cigarette. Other people were out and about, "like a woman walking her dog," but there was "no group of people" or "nothing like that" on the block, and nobody else in the immediate vicinity of defendant's apartment building.

¶ 16       Before Randolph finished his cigarette, he heard gunshots—seven or eight, he estimated. He did not know exactly where they came from, but it was somewhere "in close proximity," and it sounded like they came "from over there in the direction of the 320 building." Randolph did not see defendant or Stubblefield leave the building, either before or after the gunshots. And he never saw Stubblefield alive again.

¶ 17    Randolph testified that he was familiar with the vacant apartment. He described it as "a little hangout joint." Defendant, who had access to the vacant apartment, would typically let Randolph in.

¶ 18                                III

¶ 19    Like Randolph, Hillard lived on the same block as defendant. And she frequently hung out with defendant and Stubblefield in the vacant apartment.

¶ 20    Hillard testified that on the day of the murder, she was on the corner of Pine and Lake Streets. She saw defendant come around the corner, onto Pine Street, with someone she knew as "JR." Defendant's clothes were ripped. He told Hillard that some people "just jumped on him," and that "[h]e was going to kill [Stubblefield] and the people around the corner because they didn't help him fight."

¶ 21    JR got into his car and drove away. Defendant went inside the vacant apartment. Hillard saw Stubblefield walking by and tried to buy some cannabis from him. She also told him that he should not go into the vacant apartment because defendant was there and wanted to kill him. But defendant went in, anyway. As Hillard walked across the street, she heard five or six gunshots coming from the first floor of that building, and took off running.

¶ 22    Hillard spoke to Detective Mancuso the day after Stubblefield's body was found. On cross-examination, defense counsel confronted her with her statements from that interview. Initially, she acknowledged that she did not mention defendant. Rather, she told Mancuso that she saw Stubblefield walk into the building on Pine Street, that she heard gunshots a few minutes later, and that she was not sure if anyone went into that building before him.

¶ 23    Hillard then testified, however, that she told Mancuso that she saw defendant walking back to Pine Street shortly before the shooting, that he looked beaten up and angry, and that he said he wanted to kill Stubblefield. The parties stipulated that Mancuso's police report, in which he documented their conversation, did not include any such statements by Hillard.

¶ 24    Hillard testified that she was a heavy cannabis user around the time of Stubblefield's murder. She estimated that she smoked an ounce of cannabis daily, or at any rate, "[e]nough to not remember nothing." She also drank a pint or so of tequila at least a couple times per week.

¶ 25    But Hillard had stopped smoking cannabis by the time she spoke to Mancuso again, over three months later, in March 2012. And having had time to "think about" what happened, she had more information. In particular, defendant told her that he wanted to kill Stubblefield. The parties stipulated that Mancuso's police report does not include any such statement by Hillard.

¶ 26                                IV

¶ 27    Thompson was a longtime friend of both defendant and Stubblefield. He would typically speak to defendant on the phone daily. The day after Stubblefield was shot, defendant called Thompson on his cell phone about 10 times. Defendant said it was important, that they needed to talk. Thompson drove to defendant's apartment and picked him up.

¶ 28    Defendant looked like he had been in a fight; his face was swollen and scratched, and one of his eyes was half shut. Defendant said that Robert K.'s son and nephews attacked him—and possibly attacked Stubblefield, too, although Thompson's testimony was not always clear on this point. (For instance: "[Defendant] didn't *per se* say that [Stubblefield] didn't get jumped

- 4 -

or he didn't say that he did neither.") In any event, defendant said that he thought Stubblefield "had something to do with it" because, whether he was attacked or not, "he ran off and left."

¶ 29 That didn't sound right to Thompson, who knew that defendant and Stubblefield were close friends. Thompson asked defendant where Stubblefield was. Defendant said he didn't know, but he had been trying to reach Stubblefield on the phone since the night before.

¶ 30 With defendant in the car, Thompson drove to the dry cleaners to pick up his clothes and then dropped them off at home. He was inside for a minute or two. As he walked back to his car, which was double-parked in the alley, he saw defendant walk over to a garbage can, "[b]y the pole of the alley," and throw away a pair of black jeans and a white shirt. Thompson didn't see defendant with those clothes, or with a bag, when he first picked defendant up. But he didn't make anything of defendant's behavior at the time.

¶ 31 Two days later, Thompson learned that Stubblefield's body was found in the vacant apartment. He drove over and met up with Arbrett, Latoya, and Lamont. While talking to them, Thompson got a call from defendant, who said to him, "I am telling the police I was with you." Thompson said, "Nope," and hung up on defendant. Thompson did not tell the officers at the scene what defendant said on the phone or that defendant had thrown away some clothes in the garbage behind his house.

¶ 32 Thompson eventually spoke to the police, after they went to his house "like 30 times." On November 18, 2011, Detective Gilger searched the alley and garbage cans but did not find the clothes that defendant allegedly discarded there 15 days earlier.

¶ 33                                                                V

¶ 34 The six fired bullets recovered from the vacant apartment and Stubblefield's body were all fired from the same gun. So were the eight cartridge casings recovered from the apartment. The blood swab taken from the floor of the vacant apartment matched Stubblefield. The medical examiner, Dr. Goldschmidt, testified that Stubblefield died from multiple gunshot wounds, and that he was shot a total of 10 times—in the chest, back, pelvis, legs, hand, and groin.

¶ 35 The jury found defendant guilty of first degree murder. It also found that he proximately caused Stubblefield's death by personally discharging a firearm. The trial court sentenced him to 47 years in prison. This appeal followed.

¶ 36                                                         ANALYSIS
¶ 37                                                                I
¶ 38 Defendant first claims the State failed to prove his guilt beyond a reasonable doubt. There was no physical evidence linking defendant to the murder. Defendant did not make any inculpatory statements to the police. And there were no eyewitnesses to the shooting. The State's case was circumstantial, resting principally on the testimony of three occurrence witnesses—Randolph, Hillard, and Thompson. And not one of these witnesses, he argues, was credible.

¶ 39 In reviewing the sufficiency of the evidence, we ask whether a rational trier of fact, viewing the evidence in the light most favorable to the State, could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *People v. Ross*, 229 Ill. 2d 255, 272 (2008). With regard to the credibility of the witnesses and the

reasonable inferences to be drawn from the evidence, the trier of fact's findings are entitled to great deference, but they are not conclusive. *Ross*, 229 Ill. 2d at 272. Circumstantial evidence alone, if found credible by the trier of fact, may provide proof beyond a reasonable doubt. *People v. Jackson*, 232 Ill. 2d 246, 281 (2009); *People v. Hall*, 194 Ill. 2d 305, 330 (2000).

¶ 40                                                          A

¶ 41    We begin with Randolph, the most critical of the State's witnesses. Randolph testified that he was at the retail strip when defendant was beaten by Robert K.'s relatives. Stubblefield sat "off to the side" and did not come to defendant's aid. On the walk back home, defendant was noticeably angry with Stubblefield, and the two got into a "heated argument." On direct examination, Randolph testified that he couldn't hear what they were arguing about, but on cross-examination, he acknowledged telling the grand jury that he could: The argument concerned "why [Stubblefield] didn't help [defendant]" during the beating.

¶ 42    Randolph then saw defendant and Stubblefield go inside the same entrance to 320 North Pine Street. Defendant lived on the first floor of that building. And he had access to a vacant apartment, also on the first floor, where people from the neighborhood often hung out. Before Randolph could finish his cigarette, he heard several gunshots coming from the direction of that building. Stubblefield's body was later found in that vacant apartment.

¶ 43    Randolph, who was standing directly across the street, did not see anyone else in front of the building at the time of the shooting. He did not see defendant or Stubblefield leave the building, either before or after the gunshots. And he never saw Stubblefield alive again.

¶ 44    Randolph's testimony provides strong circumstantial evidence of defendant's guilt. Randolph clearly put defendant and Stubblefield together at the time of the murder. He also supplied a motive, at least in his grand-jury testimony: Defendant was furious that his close friend since childhood left him to fend for himself during the beating. The jury was free to credit that testimony and to treat it as substantive evidence. 725 ILCS 5/115-10.1(a), (b), (c)(1) (West 2018) (prior inconsistent statement made under oath admissible as substantive evidence). And that motive was corroborated by other witnesses, including Stubblefield's sister Latoya—to say nothing, for the moment, of either Hillard or Thompson. When a worried Latoya first went to defendant, to ask if he had seen her missing brother, defendant was still griping that Stubblefield had failed to fight by his side two days earlier. Latoya, who considered defendant a "childhood friend," had no apparent motive to lie about this, and indeed, defendant never even tries to cast doubt on her credibility.

¶ 45    But defendant does question Randolph's credibility. Let's be clear, at the outset, about what this means: Defendant does not claim that the substance of Randolph's testimony was objectively implausible, that the story Randolph told just didn't make sense, to a reasonable mind, in light of ordinary human experience. (It did.) An appellate court would be well-enough equipped to evaluate challenges like these. See, *e.g.*, *People v. Cunningham*, 212 Ill. 2d 274, 280-82 (2004) (supreme court found officer's testimony objectively "questionable" and subject to "doubt"). Defendant questions the credibility of the witness himself, not the story he narrated. He questions, in other words, whether a reasonable person could believe Randolph's testimony, given that it came from *this* witness's mouth. And that is exactly the kind of question on which our deference to the jury, which had the opportunity to observe Randolph on the stand, is necessarily at its greatest. See *People v. Wheeler*, 226 Ill. 2d 92, 114-15 (2007).

¶ 46    What reason has defendant given us to think that Randolph was lying when he implicated defendant, his friend of "10, 12 years, something like that," in a murder? For starters, defendant says, Randolph's three prior drug convictions. Whatever impeachment value those convictions may have, they hardly compel a reasonable juror to conclude that Randolph was not a reliable or trustworthy source of information about these events.

¶ 47    Nor does the fact that he was on "parole" (more precisely, mandatory supervised release) at the time of trial. In *Davis v. Alaska*, 415 U.S. 308, 317-18 (1974), a case on which defendant relies, the Court held that a witness's "vulnerable status as a probationer"—or here, parolee— could, in principle, give the witness a motive to lie and is thus an area that the defense must be permitted to explore on cross-examination. But *Davis* also made clear that a reviewing court "cannot speculate as to whether the jury, as sole judge of the credibility of a witness, would have accepted this line of reasoning." *Id.* at 317. Here, the jury was apprised of Randolph's history and current parole status and was free to draw its own conclusions, on this basis, about his credibility as a witness in this case. We will not second-guess those conclusions now.

¶ 48    Perhaps defendant's biggest knock against Randolph is the fact that Hillard contradicted him on certain points. Randolph testified, for example, that defendant walked back to 320 North Pine Street with Stubblefield, arguing all the while; Hillard testified that defendant walked back with JR, and Stubblefield came by moments later, entering the building only after briefly talking to Hillard and brushing off her warning about defendant's expressed intention to kill him.

¶ 49    The details of their recollections thus varied, but the fact "[t]hat one witness's testimony contradicts the testimony of other prosecution witnesses does not render each witness's testimony beyond belief." *People v. McCarter*, 2011 IL App (1st) 092864, ¶ 22, *overruled on other grounds by People v. Reese*, 2017 IL 120011, ¶ 42. If the jury could reasonably accept Randolph's testimony on its own terms—and it could—it was not obliged to disregard any, much less all, of the testimony that Hillard later contradicted. The jury could have found, simply, that Randolph was more credible on those points. Indeed, a reasonable jury could have credited Randolph's testimony as a whole. So we must do the same.

¶ 50                                        B

¶ 51    That brings us to Hillard. To begin, "[t]he trier of fact is free to accept or reject as much or as little of a witness's testimony as it pleases." (Internal quotation marks omitted.) *People v. Peoples*, 2015 IL App (1st) 121717, ¶ 67. Here, the jury could have found that Hillard and Randolph differed on the details but agreed on certain essentials. They both provided the same motive for defendant to kill Stubblefield. They both put defendant and Stubblefield together, inside 320 North Pine Street, at the time of the shooting. They both heard gunshots coming from that building, where Stubblefield's body was found, and where defendant lived and had access to the vacant apartment. A reasonable jury could have thus taken Hillard to corroborate the key incriminating claims of Randolph's testimony, at least somewhat, even if it also found that her recollections, to the extent they contradicted Randolph's, were mistaken about the details.

¶ 52    And let's suppose, for argument's sake, that the jury had substantial doubts about Hillard's overall credibility—due, perhaps, to some mix of her prior inconsistent statements, her disregard for the witness subpoenas issued by the trial court, and the remarkable amount of cannabis (an ounce per day) that she claimed to be smoking at the time of the murder. (To be

clear, we are *not* making any credibility findings of our own about Hillard.) Where would those doubts get defendant?

¶ 53    Not very far. Hillard provided hardly any incriminating information about defendant's conduct that Randolph had not already provided. She did accuse defendant of actually stating his intention to kill Stubblefield as he walked back home from the beating. That claim went beyond Randolph's testimony, to some degree. Still, Randolph, Latoya, and Thompson all provided the exact same motive for defendant to kill Stubblefield. So even if the jury doubted Hillard's overall credibility, those doubts would have had minimal impact on the State's case against defendant.

¶ 54                                                    C

¶ 55    That leaves Thompson. He had two prior drug convictions and a then-pending gun case, but that hardly means, as defendant claims, that any reasonable jury was obliged to discount his testimony—in part for the reasons we have already explained, and in part because he testified that he never discussed his pending gun charge with the prosecutors in this case. Thompson was defendant's friend of 10 or 15 years, who typically spoke to defendant on the phone daily and who was (to say the least) in no hurry to provide the police with incriminating information about defendant's conduct. Taking all of this into account, a reasonable juror could find Thompson, on balance, to be a credible witness.

¶ 56    Defendant told Thompson that he thought Stubblefield "had something to do with" the beating, since Stubblefield left him to fight on his own. Defendant never disputes that this testimony corroborated the other evidence of motive.

¶ 57    But defendant does claim that certain aspects of Thompson's testimony were objectively "nonsensical" and thus "unworthy of belief"—most importantly, Thompson's testimony that he saw defendant throwing away some clothes in the alley behind Thompson's house.

¶ 58    The day after Stubblefield's murder, defendant called Thompson about 10 times and said that he needed to talk. (Note the sense of urgency.) Thompson picked up defendant, drove to the dry cleaners, and then stopped at home to drop off his clothes. Thompson parked in the alley and went inside for a minute or two. As he walked back to his car, he saw defendant walk over to a garbage can and throw away a pair of black jeans and a white shirt.

¶ 59    Defendant attacks this testimony on three fronts. First, Thompson acknowledged that he did not see defendant holding a bag or any other "items in his hands" when he got into the car. And so, defendant wonders, "where did these alleged clothes come from?" Defendant thus seems to imply that, as Thompson told the story, the clothes must have materialized out of thin air.

¶ 60    If the jury found Thompson generally credible, as was its prerogative, it could easily reconcile these aspects of his testimony. Thompson may not have noticed something that defendant was holding, perhaps because he had no particular reason to be paying attention. Or defendant may have kept the clothes hidden from view as he walked to Thompson's car. Indeed, it was clear enough, from the conduct Thompson described, that defendant was trying to be surreptitious in disposing of the clothes—in an alley behind someone else's house, after that someone else had gone inside. So the fact that Thompson did not see defendant with the clothes when he first got into the car does not mean that Thompson's testimony was "nonsensical."

¶ 61     Second, defendant asserts that Thompson was too far away from the garbage can to see what defendant was throwing away. Specifically, from a distance of 25 to 30 feet, he could not have seen that it was a white shirt and black jeans.

¶ 62     For one thing, we take that estimate of the distance with a grain of salt. What Thompson actually said was that the garbage cans were "[b]y the pole of the alley." When defense counsel asked how far the pole was from the back door of his house, he estimated, "Maybe my back door is right here and the pole is probably where that officer is sitting at." The trial court then glossed this back-of-the-napkin estimate with one of its own: "25 to 30 feet." No disrespect to the trial judge (or Thompson), but the result of this process was far from a reliable measurement of the distance at issue. What we know is that Thompson claimed to see defendant from a distance that fit comfortably within the confines of a single courtroom—it roughly corresponded to the distance between the witness stand and an officer seated somewhere in the room. Does it "def[y] common sense," as defendant asserts, that Thompson could see what defendant was throwing away from some such distance? We would not go that far.

¶ 63     Third, defendant notes that the police searched the garbage cans and did not find any clothing. True, but that was 15 days later, which makes this a fact of little consequence.

¶ 64     Thompson also testified that while he was outside 320 North Pine Street, after learning that Stubblefield's body had just been found, defendant called him and said, "I am telling the police I was with you." Thompson said, "Nope," and hung up. Defendant says that this testimony should carry "little weight." That argument is a non-starter on appeal. Thompson's testimony was not objectively absurd or unbelievable. Thus, it was for the jury to decide what to make of it and how much "weight" it deserved. *Ross*, 229 Ill. 2d at 272.

¶ 65                                    D

¶ 66     Lastly, defendant argues that his behavior in the days following Stubblefield's murder was "inconsistent with someone who had just murdered his best friend." In particular, he went to the police station with Latoya to file a missing person's report, spoke to Lamont on the phone, and "took [Stubblefield's] mother and sister around the apartment building looking for [him]."

¶ 67     That last assertion is, at best, an exaggeration. But more importantly, defendant never explains how, in his view, we should expect someone to behave when his best friend has gone missing. Should he *not* help (or at least feign to help) look for him? Should he *not* speak to family members or help them file a missing persons report? Wouldn't his failure to do those things tend to raise suspicions? The family of a missing person would surely expect some cooperation and concern from his best friend. To put the same point differently: After murdering one's best friend, plain sight might very well be the best place to hide. That is a reasonable view of defendant's conduct here.

¶ 68     In sum, a reasonable jury could have found that the State's witnesses were credible, on the whole, and that their testimony made a strong circumstantial case that defendant murdered Stubblefield. The evidence was sufficient to prove defendant's guilt beyond a reasonable doubt.

¶ 69                                    II

¶ 70     Over defense objection, the trial court granted the State's motion to extend the speedy-trial term by 60 days. The extension was granted so that the State could continue to look for

defendant's cousin, Quincy Courts, who had made a statement to the police before going on the lam. Defendant challenges that ruling as an abuse of discretion, arguing that the State failed to present reasonable grounds to believe that Courts would be found anytime soon.

¶ 71    The United States and Illinois Constitutions guarantee a criminal defendant the right to a speedy trial. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8. Section 103-5 of the Code of Criminal Procedure of 1963 provides an additional statutory right to a speedy trial. 725 ILCS 5/103-5 (West 2018). Section 103-5 "implements" the constitutional right to a speedy trial, but the statutory and constitutional rights are not "equivalent" or "coextensive." *People v. Crane*, 195 Ill. 2d 42, 48 (2001); *People v. Gooden*, 189 Ill. 2d 209, 217 (2000). Instead, the statute " ' "operates to prevent the constitutional claim from arising except in cases involving prolonged delay or novel issues." ' " *Crane*, 195 Ill. 2d at 48 (quoting *People v. Anderson*, 53 Ill. 2d 437, 441 (1973), quoting *People v. Stuckey*, 34 Ill. 2d 521, 523 (1966)).

¶ 72    Defendant all but equates the statutory and constitutional rights, but his arguments, in substance, address the statutory right only. See *id.* at 47-48 (constitutional claim requires consideration of factors beyond those in statute); *Barker v. Wingo*, 407 U.S. 514 (1972) (criteria for violation of constitutional right).

¶ 73    Section 103-5 provides that every incarcerated defendant must be tried within 120 days of the date he was taken into custody, excluding any delays occasioned by the defendant. 725 ILCS 5/103-5(a) (West 2018). That speedy-trial period may be extended once, by up to 60 days, if the trial court finds "that the State has exercised without success due diligence to obtain evidence material to the case and that there are reasonable grounds to believe that such evidence may be obtained at a later day." *Id.* § 103-5(c).

¶ 74    A

¶ 75    As an initial matter, the State argues that this issue is forfeited because defendant failed to raise it in his motion for new trial. Generally, issues that can be raised before or during trial must be raised at that time, and again in a posttrial motion, or else they are forfeited. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). We have thus held that this issue is forfeited when defense counsel objected to the State's request for an extension of the speedy-trial term but failed to preserve the issue in a motion for new trial. See, *e.g.*, *People v. McKinney*, 2011 IL App (1st) 100317, ¶ 29.

¶ 76    Defendant says that we reached the opposite conclusion in *People v. Exson*, 384 Ill. App. 3d 794, 798-99 (2008), where we held that a speedy-trial claim was preserved for review even though it was not raised in the motion for new trial. But the posture of the claim in *Exson* was different. There, the defense not only objected to the State's motion to extend the speedy-trial term (as defendant did here) but also filed a motion to dismiss based on an alleged violation of the speedy-trial statute that resulted from the trial court's extension of the term over defense objection. *Id.* at 799. In those circumstances, we said, the trial court had sufficient opportunity to consider the claim later raised on appeal; presenting the issue yet again in a posttrial motion would have made no difference; and thus, the "purpose of preserving a claim of error" was fully served by the defendant's presentation of the issue, twice over, to the trial court. *Id.*

¶ 77    Here, defendant did not file a motion to dismiss based on the speedy-trial violation he now alleges on appeal. (Even less did he file a motion to dismiss and a motion to reconsider the denial of that motion, as in *People v. Patterson*, 392 Ill. App. 3d 461, 464 (2009), the other case defendant cites.) After objecting to the State's motion to extend the trial term, he did not

renew that objection or otherwise raise his speedy-trial issue below; his contemporaneous objection was his first, last, and only word on the matter. *Exson* is thus distinguishable, and the rationale of that case does not apply on the facts of this one.

¶ 78 The appellate court in *Exson* based its decision on *People v. Heider*, 231 Ill. 2d 1 (2008), which defendant also cites. The question in *Heider* was whether a defense argument at the sentencing hearing was similar enough to an argument in the postsentencing motion, such that the defense raised the same issue, in both contexts, for the trial court's consideration. *Id.* at 14-18. The supreme court held that it was, that despite some differences in presentation, the issue *was* raised *both* at the sentencing hearing and in the postsentencing motion, as forfeiture principles ordinarily require. *Id.* at 18. Thus, "the trial court clearly had an opportunity to review the same essential claim that was later raised on appeal," and hence the claim was preserved for review. *Id.* And as the supreme court noted, affording the trial court that opportunity is "one"—if not the primary—"reason" for requiring a claim to be properly raised and preserved below. *Id.*

¶ 79 We cited this general principle in *Exson*, 384 Ill. App. 3d at 799, when we found that the purpose of preserving the defendant's speedy-trial claim was fulfilled by his presentation of that claim below. But we did not hold, as defendant here asserts, that a speedy-trial claim need not be raised in a motion for new trial, full stop. That broad proposition would have been overkill, since the defendant in *Exson* renewed his objection in a motion of his own (albeit not in a motion for new trial). And there is no logical way we could have derived that broad proposition from *Heider* because the supreme court there found that the issue *was* raised in the postsentencing litigation.

¶ 80 In short, neither *Exson* nor *Heider* supports defendant's argument that he preserved his speedy-trial issue, despite failing to renew his contemporaneous objection to the State's motion to extend the trial term.

¶ 81 The logic of defendant's argument also faces a more general problem: It seems to apply *whenever* the defense objects to a State motion, of whatever kind, but then fails to preserve the objection in a posttrial motion. That is, defendant does not explain how a speedy-trial claim is distinguishable from other claims that certainly must be raised in a posttrial motion (or other motion that allows the trial court to timely correct any alleged error). Without any limiting principle, defendant's argument thus amounts to a wholesale abandonment of, rather than a reasoned exception to, the default forfeiture principles that our supreme court has instructed us to enforce.

¶ 82 Defendant also argues that the constitutional issue exception to forfeiture first recognized in *Enoch*, 122 Ill. 2d at 190, applies here. In *Enoch*, the supreme court held that appellate review of issues not raised in a posttrial motion is limited to plain error, sufficiency of the evidence, and "constitutional issues which have properly been raised at trial and which can be raised later in a post-conviction hearing petition." *Id.*; see *People v. Cregan*, 2014 IL 113600, ¶¶ 17-20 (holding that constitutional issue exception recognized in *Enoch*, a capital case, applies equally to noncapital cases).

¶ 83 The constitutional issue exception does not apply. As we noted above, the statutory right to a speedy trial is distinct from the constitutional right. *Crane*, 195 Ill. 2d at 48; *Gooden*, 189 Ill. 2d at 217. Thus, it may not be raised later in a postconviction petition, as *Enoch* and *Cregan* require. *People v. French*, 46 Ill. 2d 104, 107 (1970). And here, defendant's argument is limited to his statutory right, as he does not even arguably address the elements of a constitutional

claim, most notably the requirement of showing that he was prejudiced by the delay. See *People v. Staten*, 159 Ill. 2d 419, 426-27 (1994).

¶ 84    Because defendant has not shown that his statutory speedy-trial claim was preserved, we review his claim for plain error. *McKinney*, 2011 IL App (1st) 100317, ¶ 29 (speedy-trial right is fundamental, so issue reviewable as second-prong plain error). Alternatively, defendant asks that we consider the claim under the rubric of ineffective assistance of counsel.

¶ 85                                        B

¶ 86    In April 2015, as the trial came onto the horizon, the State began looking for Courts, in earnest, in Chicago. In late June 2015, the State learned that Courts was living or spending time in Hennepin County, Minnesota (that is, Minneapolis and its surroundings), and began looking for him there, too. In July 2015, the trial court granted the State's motion to declare Courts a material witness. By the time of the motion hearing, on September 15, 2015, the State still had not found him, despite the concerted efforts of Detective Mancuso and two investigators from the Cook County State's Attorney's Office, Erin Vasilopoulos and Marta Kucharczyk. The trial term was set to expire shortly, on October 1, 2015.

¶ 87    At the motion hearing, Mancuso, Vasilopoulos, and Kucharczyk testified that they looked for Courts, to no avail, at his previous known Chicago addresses. Mancosu also canvassed the neighborhood, enlisting the help of tactical officers from the 15th District, to whom he handed out copies of Court's rap sheet, mug shots, and possible addresses. All three witnesses also spoke to Courts's mother, Debra Courts, several times about his possible whereabouts. Debra said that he "was staying in Minnesota," where his son lives. Debra did not provide a working phone number for her grandson (though at one point she did provide a number that proved to be no longer in service), and the investigators did not believe that she was fully cooperative or forthcoming.

¶ 88    Vasilopoulos learned from her investigation that Courts might have been staying at a Salvation Army in Hennepin County. A search of that location by a local sheriff's officer revealed that Courts did indeed stay there for a time, but he was no longer doing so. And a warrant for Court's arrest had been issued in Hennepin County, after he failed to appear on a drug case that he picked up there. That was sometime in June 2015, as best Vasilopoulos could remember.

¶ 89    Vasilopoulos also spoke to Al Thompson and Tyisha Hillard. Thompson said that Courts had been seen "staying on the street on the west side" from time to time and that "he goes back and forth" between Chicago and Minnesota, in an effort to "avoid[ ] coming to court." Hillard said that Courts, defendant's first cousin, "don't want to testify regarding this case." That was the word on the street, anyway.

¶ 90    The State also made two factual representations to the trial judge. First, the State had just learned, on the day of the hearing, that there could now be as many as three active warrants for Courts in Minnesota. Second, the Hennepin County authorities had moved to domesticate the material witness subpoena issued for Courts, so that they could serve him in the event they found him within their jurisdiction.

¶ 91    Turning to the merits of defendant's claim, we appreciate and accept his concession that the State exercised due diligence in trying to locate Courts. And there is no dispute that Courts was a material witness. (In his statement to the police, Courts reported incriminating

admissions that defendant allegedly made to him.) Thus, the only question we must address is whether the State offered "reasonable grounds to believe" that its continued efforts to find Courts would be successful. See 725 ILCS 5/103-5(c) (West 2018). We review the trial court's determination for a clear abuse of discretion. *Exson*, 384 Ill. App. 3d at 798.

¶ 92    Courts was elusive, and deliberately so. If the authorities found him, not only would he have to testify in this case, against his first cousin, which clearly he did not want to do, he would also have to appear in court and face his own cases in Minnesota, which thus far he had managed to avoid doing. So Courts had every incentive to elude the authorities for as long as possible. And Courts's mother, as the investigators concluded, was less than fully candid and cooperative with them. In these circumstances, finding Courts in time for defendant's trial was by no means a foregone conclusion. On balance, it may even have been somewhat unlikely.

¶ 93    But it goes too far to say that any expectation of finding Courts was " 'arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it.' " *People v. Lerma*, 2016 IL 118496, ¶ 23 (standard for abuse of discretion (quoting *People v. Rivera*, 2013 IL 112467, ¶ 37)). It is not as if the authorities had no idea whatsoever of Courts's general whereabouts. They knew from Thompson that he was recently seen in the area. They knew that he had recently stayed at a Salvation Army facility in Minneapolis. They knew that he had a son in the Minneapolis area, with whom he kept in contact. And they knew that he was travelling between the two cities regularly. These were all legitimate leads as to his current whereabouts. What's more, the State represented at the hearing that Courts had recently picked up new cases in Minnesota, resulting in perhaps as many as three warrants now outstanding for his arrest there. An increased interest in finding him, and thus redoubled efforts to do so by the local authorities, was at least plausible, if not likely.

¶ 94    Thus, from the trial court's perspective at the time of the hearing, there was some reason to believe that the State's diligent efforts to find Courts might pay off. Granted, there was also some reason to believe they might not. But that is not enough to show a clear abuse of discretion. It was perhaps a close call, but it was not arbitrary or unreasonable for the trial court to extend the speedy-trial term as authorized by the statute.

¶ 95    Defendant's cited cases do not show otherwise. None of those cases found that the trial court unreasonably determined that a missing witness might be located in time for trial. Instead, defendant argues that the State's prospects for finding the witness were better in those cases than they were here. For example, in *People v. Winfield*, 113 Ill. App. 3d 818, 824 (1983), the witness responded to the State's efforts to contact her the day before the hearing. In *People v. Antrim*, 67 Ill. App. 3d 1, 4 (1978), the witness had been arrested 10 days earlier for a violation of probation (although it is not clear he was in custody). And in *People v. Morgan*, 62 Ill. App. 3d 279, 283 (1978), the witness's family members confirmed that she lived at the address that the State's investigators visited and promised to tell her that she was expected to appear in court.

¶ 96    The State was not quite nipping at Courts's heels, as perhaps it was in the cases defendant cites. But as the State points out, none of these cases purport to establish minimum requirements for "reasonable grounds to believe" that a witness might be found. There may have been *more* reason to believe the State would succeed in those cases, but there was enough reason here for the trial court to act within its sound discretion.

¶ 97    Because there was no error at all, there was no "clear and obvious" error, as defendant must show on plain error review. *People v. Harvey*, 2018 IL 122325, ¶ 15. For the same reasons,

defendant cannot show that he was prejudiced by defense counsel's failure to properly preserve the issue for appellate review. Defendant has not shown either plain error by the trial court or ineffective assistance of counsel.

¶ 98                                                    III

¶ 99        Defendant argues that the State improperly elicited prior consistent statements made by Randolph and Hillard to the police, prosecutors, and the grand jury to bolster the credibility of their trial testimony. See Ill. R. Evid. 613(c) (eff. Jan. 1, 2011); *People v. Cuadrado*, 214 Ill. 2d 79, 90 (2005).

¶ 100       Defendant's claim is based on the following exchanges between the prosecutor and the witnesses during direct examination. First up, Randolph:

> "Q. And after [Stubblefield's] body was found later in November, did you have the opportunity to speak with detectives from the Chicago Police Department who were, in fact, investigating the murder of Levi Stubblefield?
>
> A. Yes, I did. I talked to I think his name is Mancuso, Detective Mancuso at Grand and Central.
>
> Q. You also spoke with a couple of state's attorneys regarding what you knew as well?
>
> A. Yes, I did.
>
> Q. And you finally testified to the members of the Grand Jury in this very building and told the grand jurors what you saw. Is that right?
>
> A. Yes, I did."

And now Hillard:

> "Q. Did you then come here to the court building and speak with an assistant state's attorney in February, on February 6 of 2013?
>
> A. Yes.
>
> Q. And you spoke with an assistant state's attorney. It was a male assistant state's attorney. Correct?
>
> A. Yes.
>
> Q. You talked about what happened. Right?
>
> A. I don't know. I can't remember.
>
> Q. You don't remember? Well, after speaking—after coming to the building, did you go the Grand Jury and testify?
>
> A. Yes.
>
> Q. Yes? Did you tell the ladies and gentlemen of the Grand Jury what you had seen and heard?
>
> A. Yes."

¶ 101       What prior consistent statements did the State elicit from Randolph and Hillard during these exchanges? We do not see any, much less five, as defendant contends. (Three by Randolph, to the police, prosecutors, and grand jury; and two by Hillard, to prosecutors and the grand jury.) These exchanges merely revealed that the State's key witnesses spoke to law enforcement and testified to the grand jury. So the jury now knew (if it didn't already) that the witnesses made statements about the case before trial. But the jury did not know, because it

- 14 -

was not told, *what* the witnesses said in those statements; the content of those statements was not introduced.

¶ 102    (At least not by the State. On cross-examination, defense counsel did introduce some of their prior statements—to impeach the witnesses with their *in*consistencies. But that does not support defendant's claim, in part because the statements were not introduced by the State, and in part because they were impeaching rather than bolstering.)

¶ 103    If the *content* of the witnesses' prior statements was not introduced, there is no sense in which their *statements* were introduced at all. Defendant argues that these exchanges nonetheless conveyed an "obvious implication" that whatever the witnesses said to law enforcement and the grand jury must have been consistent with their trial testimony. Why else, he asks, would the State bother to point out that the witnesses made those statements? And that "implication," he claims, is enough for us to find error. In other words, the general rule against prior consistent statements can be violated even when no prior consistent statements are actually introduced.

¶ 104    Rather, defendant would have us find error when the State conveys to the jury the mere fact that its witnesses provided unspecified information about the case before testifying at trial. This fact—if it isn't already obvious—is often conveyed, as a matter of course, by the State's presentation of its case. And this fact, on its own, does not unfairly bolster the credibility of the State's witnesses. As defendant acknowledges, prior consistent statements are unfairly bolstering because " '[p]eople tend to believe that which is repeated most often, regardless of its intrinsic merit, and repetition lends credibility to testimony that it might not otherwise deserve.' " *People v. Johnson*, 2012 IL App (1st) 091730, ¶ 60 (quoting *People v. Smith*, 139 Ill. App. 3d 21, 33 (1985)). When the State does not disclose to the jury *what* the witnesses said about the case before trial, there is no "repetition" of their trial testimony, and thus no unfair bolstering.

¶ 105    Without disclosing anything that was said to law enforcement or the grand jury, the State merely elicited the fact—for whatever it was worth—that the witnesses were not speaking up for the very first time at trial. This fact alone does not unfairly prejudice a defendant, and thus the rule against prior consistent statements does not apply in these circumstances. To hold that it does would expand the rule far beyond its recognized scope and place needless, perhaps unworkable, restrictions on the State's presentation of its case.

¶ 106    Because the State never elicited the content of any prior statements made by Randolph or Hillard, the record rebuts defendant's assertion that their testimony was bolstered with their prior consistent statements. There was no error at all, much less plain error, as defendant contends, or any ineffective representation by counsel in failing to object to these exchanges.

¶ 107                                                                    IV

¶ 108    To facilitate the medical examiner's testimony about the cause and manner of death, the trial court allowed the State to show Stubblefield's autopsy photos to Dr. Goldschmidt. The trial court agreed with the defense, however, that the autopsy photos should not be published to the jury, at least not during the presentation of evidence. The trial court was primarily "concerned" about the photos that showed Stubblefield's genitals and an entrance wound in his pubic area. In the trial court's view, the jury didn't "need[ ] to see those pictures" when the cause and manner of death were not in dispute. The trial court reserved its ruling on whether any of the autopsy photos would go back to the jury room during deliberations. After closing

- 15 -

arguments, the trial court ruled that they would, since they were relevant to the jury's assessment of the theory of defense. (More on that theory soon.)

¶ 109    That ruling, defendant argues, was error. The autopsy photos, he says, were not relevant to any disputed issue, including the theory of defense; were needlessly graphic, especially the ones that depicted Stubblefield's genitals; and could only serve to inflame the jury's passions. Thus, they should have been excluded—if not as irrelevant, then at least as more prejudicial than probative.

¶ 110    We review the trial court's evidentiary rulings, including the decision to allow the jury to view photographs of a deceased victim, for an abuse of discretion. *People v. Chapman*, 194 Ill. 2d 186, 219 (2000).

¶ 111    Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ill. R. Evid. 401 (eff. Feb. 1, 2011). Photographic evidence is generally admissible, and may be shown to the jury, if it is relevant to some fact that is "at issue" (*Chapman*, 194 Ill. 2d at 219) or, in the language of Rule 401, "of consequence" (Ill. R. Evid. 401 (eff. Feb. 1, 2011)). Among the "valid reasons" for admitting photographs of a murder victim are to prove the nature and extent of the injuries, or the manner and cause of death, or to facilitate the testimony of a witness, such as the medical examiner. *Chapman*, 194 Ill. 2d at 220.

¶ 112    These "valid reasons" are certainly present here. Defendant argues, however, that to be admissible, evidence must be relevant to prove a fact that is *disputed* at trial, and here, neither the cause and manner or his death, nor Stubblefield's injuries generally, were in dispute.

¶ 113    Not so. The State is allowed to prove every element of the charged offense and every relevant fact, "even though the defendant fails to contest an issue or is willing to stipulate to a fact." *People v. Bounds*, 171 Ill. 2d 1, 46 (1995). In other words, the State may offer evidence that tends to prove any fact it needs to prove, such as the cause or manner of death, even if that fact is not disputed.

¶ 114    Rule 401 says the same thing. Defendant asserts, in his reply brief, that a fact is only "of consequence to the determination of the action," within the meaning of the rule, if it is disputed. See Ill. R. Evid. 401 (eff. Jan. 1, 2011). But it is well settled that "the phrase 'fact of consequence' *** extends to facts not in dispute." Michael H. Graham, Cleary and Graham's Handbook of Illinois Evidence § 401.1, at 142 (9th ed. 2009) (citing cases); Fed. R. Evid. 401, Advisory Committee Notes ("[t]he fact to which the evidence is directed need not be in dispute"); see *People v. Thompson*, 2016 IL 118667, ¶ 40 (where Illinois rule modeled on federal counterpart, we may look to federal sources).

¶ 115    For this reason, our supreme court has held that autopsy photos of a murder victim were properly admitted, published, and sent back to the jury room even though the cause of death, as established by the medical examiner's testimony, was not disputed at trial. *Bounds*, 171 Ill. 2d at 46-47. Here, too, the autopsy photos were relevant, for at least the reasons cited above—to prove the cause and manner of death, and to facilitate Dr. Goldschmidt's testimony.

¶ 116    The trial court found, however, that these reasons did not warrant publishing the autopsy photos to the jury. Relevant evidence may still be excluded if "its probative value is substantially outweighed by the danger of unfair prejudice." Ill. R. Evid. 403 (eff. Jan. 1, 2011). And evidence, while still relevant, has diminished probative value when the fact it is offered

to prove is not in dispute. Graham, *supra* § 403.1, at 189. Evidence offered to prove undisputed facts is thus more likely to be excluded under Rule 403's balancing test. *Id.* Here, because the cause and manner of death were not in dispute, the trial court initially found that the autopsy photos had minimal probative value. And because they were to some degree inflammatory, particularly the ones that showed Stubblefield's genitals, the autopsy photos initially failed Rule 403 balancing.

¶ 117    But the balance shifted after closing arguments. Counsel argued that defendant could not have killed Stubblefield, because defendant's blood was not found in the vacant apartment. And it would have been, or so counsel argued, since defendant had been beaten up moments earlier, and surely would have had significant bleeding at the time of the shooting. The State countered in rebuttal that there was no evidence of how badly he was bleeding (if at all); and in any event, whatever blood there was could have been "on his clothes that he got rid of." So the absence of his blood on the floor of the vacant apartment was not a significant exculpatory fact.

¶ 118    The trial court ruled that (most of) the autopsy photos could go back with the jury during deliberations, since they were relevant to the competing theories presented in closing arguments. To assess the defense theory, the jury had to decide what to make of the fact that defendant's blood was not found in the vacant apartment. As the trial court correctly pointed out, not much of Stubblefield's blood was found there, either. The crime-scene photos showed a small spattering near his body, but that was all. Far from bleeding all over the apartment, Stubblefield's "own blood seems to have seeped into [his] clothing," leaving only "a dirt" (surely a mistaken transcription of "dearth") "of his own blood" on the floor. And recall that Stubblefield was shot 10 times, "all over his body."

¶ 119    If someone who sustained *those* injuries spilled so little blood on the floor, then it would seem entirely possible that defendant—who endured a few minutes of fisticuffs rather than 10 gunshot wounds—might not have spilled *any* on the floor. Like Stubblefield, if defendant had any bleeding at all (and there is no evidence that he did), it could have been absorbed, or largely absorbed, by his clothing. Or so the jury might reasonably think.

¶ 120    The trial court's point, in sum, was that the defense theory put Stubblefield's injuries at issue. Not because the fact or extent of his injuries was now disputed, but because the jury now needed to decide what inferences to draw from those injuries. The jury thus needed to grasp their full extent, and visualizing the injuries, by viewing the autopsy photos, would aid the jury in doing so. After closing arguments, the autopsy photos became relevant for this purpose, too.

¶ 121    That finding was reasonable. And so was the trial court's determination that, in light of their newfound relevance to a disputed question of fact, the probative value of the photos was no longer substantially outweighed by the risk of unfair prejudice.

¶ 122    Overall, the autopsy photos were not as "grisly" as defendant would have us believe. True, they depict a murder victim whose body was riddled with gunshots wounds, and to some degree, that is unavoidably "distressing." However, the photos show relatively "clean wounds," and photos of a dead body with 10 gunshot wounds probably do not get much more "antiseptic" than these. See *People v. Henderson*, 142 Ill. 2d 258, 321 (1990).

¶ 123    The trial court reasonably determined that the photos showing Stubblefield's genitals and nearby entrance wound were more "concerning" than the others. But not so concerning that the jury needed to be shielded from them even after they became relevant to a disputed issue: "We are all adults," the trial court fairly noted. And the trial court took a measured approach,

excluding the most graphic photos—in particular, the photo that most clearly and fully showed Stubblefield's genitals, from a frontal view—as duplicative and unnecessary for the purpose at hand.

¶ 124    In these circumstances, the risk of unfair prejudice was not so great that it substantially outweighed the value of the photographs for assessing the defense theory. We find no abuse of discretion in allowing the jury to view the autopsy photos during deliberations.

¶ 125                                                    CONCLUSION

¶ 126    For the foregoing reasons, we affirm defendant's conviction and sentence for first degree murder.

¶ 127    Affirmed.