2022 IL App (1st) 200811-U

FIFTH DIVISION
September 16, 2022

No. 1-20-0811

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court of Cook County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 10 CR 14711 |
| | ) | |
| BLANCA SOLIS, | ) | |
| | ) | Honorable Geary W. Kull, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE CONNORS delivered the judgment of the court.
Presiding Justice Delort and Justice Cunningham concurred in the judgment.

**ORDER**

¶ 1     *Held:*  Defendant did not make a substantial showing that her trial counsel was ineffective; postconviction counsel provided reasonable assistance; affirmed.

¶ 2     Defendant, Blanca Solis, appeals from an order of the circuit court that granted the State's motion to dismiss her petition for relief under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2018)). Solis contends that her petition should be remanded for an evidentiary hearing on her claim that her trial counsel was ineffective for not litigating a motion

to suppress her statement. Solis asserts that an FBI agent threatened her and she did not have a Spanish interpreter during *Miranda* warnings and her resulting interrogation. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4     Along with four codefendants, Solis was charged with the July 2010 aggravated kidnapping of Zita Paniagua. One of Solis's codefendants was her boyfriend, Marco Cadenas, who was also known as Mike.

¶ 5                              A. Pretrial Proceedings

¶ 6     At a status hearing in October 2010, the trial judge asked Solis if she understood English, to which Solis responded, "Yes." Solis also said, "Okay," after the judge noted that an attorney would be appointed. Solis was subsequently represented by attorney Christopher Bemben. At another court date, Solis answered, "Yes, please" to the judge's question about whether Solis needed a Spanish interpreter, like her codefendants did. At two other court dates, Solis stated that she spoke English.

¶ 7     On March 13, 2012, Bemben filed a motion to suppress that asserted that Solis's statements to law enforcement after her arrest were obtained after she had chosen to remain silent and/or consult with an attorney. Solis was also confronted with "certain material misrepresentations," and she experienced "psychological and mental coercion."

¶ 8     On August 21, 2012, Bemben informed the court that Solis had hired new attorneys—John Paul Carroll and an associate—who were present in court, and he withdrew the motion to suppress. Solis's new counsel stated, "We may be demanding trial." Counsel filed a demand for a speedy trial on August 23, 2012, but the court found that the demand was ineffective. Counsel again demanded trial on October 30, 2012.

¶ 9    At a later court date, an assistant State's Attorney noted Carroll had a pending complaint before the ARDC. The following colloquy occurred between the trial court and Solis:

> "THE COURT: Okay. Ms. Solis, are you aware that Mr. Carroll, in fact, does have a complaint pending before the Attorney Registration Commission?
>
> THE DEFENDANT: No, your Honor.
>
> THE COURT: He has not made you aware of that information?
>
> THE DEFENDANT: No, your Honor.
>
> * * *
>
> THE COURT: Do you wish to go forward with this case and have Mr. Carroll as co-counsel in this matter?
>
> THE DEFENDANT: Yes, your Honor."

¶ 10    Before jury selection, the trial court told Solis that it was her decision whether she pled guilty, had a jury trial, testified, and appealed if she was convicted. The trial court asked, "Do you understand what I've indicated to you[?]" Solis replied, "Yes, your Honor." Defense counsel then requested a Spanish interpreter. Earlier, Solis had declined an interpreter. The trial court noted that Solis was "very fluent" in English and "obviously bilingual." The court recalled that Solis understood the exchange about whether she still wanted Carroll to represent her and the admonishments about her fundamental rights. Defense counsel stated that he would speak to Solis in English, and she would not understand and ask to repeat in Spanish. The trial judge and Solis had the following discussion:

> "THE COURT: Ms. Solis, did you not indicate to this Court that you did not need the services of a Spanish interpreter?

THE DEFENDANT: Yes, your Honor.

THE COURT: I speak to you and I don't even hear an accent when you speak.

THE DEFENDANT: I don't understand a hundred percent. That's why—that's my concern.

THE COURT: You know, people who speak English don't understand the language a hundred percent. *** You certainly have shown that you have a command of the English language in all the months that you have been coming before this Court, which has been more than one year.

THE DEFENDANT: Because there's not a lot of things to understand because it was always continuance, continuance. *** [I]t wasn't hard to understand, but since I'm going to be on the stand ***, I need to understand perfectly word by word because I don't want to make mistakes."

¶ 11 Solis further explained that she had alerted her former attorney that she did not understand some aspects of the proceedings. Solis estimated that she "can understand probably 80 percent. That's why it makes me feel comfortable and confident. But since now it's like this, I just feel that I need a translator to help me." Solis added that she could "understand better, but when I need to talk, sometimes I just can't use the right words, you know—that's my concern—to express myself."

¶ 12 Defense counsel also filed a motion for an interpreter that stated in part that Solis moved to Texas from Mexico when she was 17. Sometimes, Solis would indicate that she understood what was being spoken in English, even though she did not really understand. The court ultimately arranged for an interpreter to be present at trial.

¶ 13                                          B. Jury Trial

¶ 14     In his opening statement at the December 2012 jury trial, defense counsel asserted in part that Solis grew up in Juarez, Mexico, where two gangs—the Zetas and the Linas—"were the strongest." Solis learned that "you don't call the police." Defense counsel further stated that Solis was in a relationship with a man named Mike who was a member of the Zetas and had threatened to kill Solis and her family. Mike decided to kidnap Solis's hairdresser and told Solis to drive a car used in the scheme. Solis was frightened for her safety and the safety of her children.

¶ 15     Zita Paniagua, the victim, testified that she was the owner of a beauty salon in Cicero, Illinois, and Solis was one of her customers.[1] In June 2010, Solis visited the salon and told Zita that she should be very careful because the owner of a shoe store had been kidnapped and held for ransom. When Zita left the salon on July 14, 2010, and walked to her car, a man pushed her into a van, tied her hands and feet with tape, and put a hat over her face. Another man was in the driver's seat of the van. The two men took Zita's cell phone and told her that they were going to give her husband instructions, and they would kill her if they did not get money. Zita was eventually taken into a room and blindfolded. Zita believed that the person who placed the blindfold on her was a woman, based on the person's breathing and soft hands. Zita remained in the room the entire night.

¶ 16     Zita's husband, Roberto Paniagua, testified that after Zita was kidnapped, he received a call from Zita's phone and was told to pay $200,000 by the next day. After Roberto contacted friends and family about getting the ransom money, Roberto was contacted by the Cicero police department.

¶ 17     FBI Special Agent Matthew Alcoke, who was part of the Violent Crimes Task Force in summer 2010 and involved in the kidnapping investigation, testified that he learned that one of the

---

[1] We recounted the full facts presented at trial in a previous order that addressed Solis's direct appeal: *People v. Solis*, 2015 IL App (1st) 130379-U.

kidnappers demanded that the ransom be left at or near a restaurant at Harlem and Cermak. While conducting surveillance, he saw Solis, Cadenas, and another man leave a house and enter a white car, with Solis in the driver's seat. Alcoke followed the white car, which eventually pulled into an alley behind the restaurant. Cadenas got out of the car and jogged over to the ransom package. Cadenas was placed in custody, and Solis was detained nearby. Zita was recovered safely from the house where she was kept. Five people were arrested for Zita's kidnapping.

¶ 18     During the cross-examination of a Cicero police department detective, the State objected to defense counsel's question about whether the officers involved in the incident spoke Spanish. Defense counsel explained that because the State would introduce a statement that Solis allegedly made in English, defense counsel planned to contend that "they selected some English-speaking people instead of Spanish-speaking people." The defense position was that Solis "[did] not have the command of the English language." The trial court disagreed, stating:

> "We all know she speaks English. Again, you're not going to try to lead this jury down a path that she does not speak or understand English. She has been in this courtroom for many, many months, she has been speaking English in this courtroom, she has been understanding English. I inquired of her at length with regard to a Spanish interpreter, and she felt that she would be more comfortable with a Spanish interpreter, and that's where we are today. So, no, I am not going to allow you to do that."

¶ 19     Peggy Konrath, a forensic scientist for the Illinois State Police, testified that among the evidence she received was a roll of duct tape and identifying information for the suspects. According to Konrath's analysis, one set of fingerprints recovered from the roll of duct tape matched Solis's fingerprint card. Cadenas's fingerprints were also found on the tape.

¶ 20    Detective Chris Wojtowicz of the Cicero Police Department testified that he interviewed Solis after her arrest. Solis was given *Miranda* warnings before the interview, and Detective Wojtowicz and another detective spoke to Solis in English for at least two hours. The next morning, Solis was again given *Miranda* warnings before she was interviewed in English by Detective Wojtowicz and assistant State's Attorney Stephanie Buck. Detective Wojtowicz did not have any problem understanding Solis, and Solis did not have any difficulty understanding the detectives or ASA Buck.

¶ 21    ASA Buck testified that Solis indicated that she understood her *Miranda* rights by answering "yes" after each right was read to her. After Solis made oral admissions about the kidnapping, Solis agreed to give a statement that was typed by ASA Buck. Solis reviewed the entire statement, signing the bottom of each page as it was read. ASA Buck and Solis conversed in English, and Solis did not have any trouble communicating. Solis read the entire first page of her statement out loud in English in front of ASA Buck and a detective.

¶ 22    Solis's statement was published to the jury and stated in part as follows. Solis lived in Schiller Park with her two children and her boyfriend, Cadenas. Solis was born in Mexico and lived in Texas and California before moving to Cicero. In April 2010, Cadenas started talking about kidnapping someone, stating that he wanted to get money so that he and Solis could live better. Cadenas asked Solis how good Zita's business was, if she owned the salon and its building, and what kind of car she had. Solis responded that Zita owned the salon and the building, she drove a black Cadillac truck, and the business in the salon was always good. Solis also affirmed to Cadenas that Zita could come up with $50,000 and was a good person to kidnap. In early May 2010, Cadenas called two men to help them kidnap Zita. Solis and Cadenas showed the men where Zita worked and parked her car, as well as identified Zita. Around three weeks before the

kidnapping, to see how Zita would react, Solis told Zita to be careful because someone was making extortion calls to someone that Solis knew.

¶ 23    The statement continued that on July 14, 2010, Cadenas arranged to meet the two other men at Zita's salon that evening. Around 5 p.m., Solis and Cadenas waited by the salon until a van arrived. Solis and Cadenas switched seats in their car so that Solis was driving. Solis saw Zita walk out of the salon and the van leave, but she did not see what happened to Zita. Solis followed Cadenas's instructions about how to drive the car and overheard Cadenas calling Zita's husband. They all drove to a house, where Solis waited in the car for 20 minutes until Cadenas came back outside. Solis drove home with Cadenas. Cadenas told Solis, "we're good," he had "made the call" and "taped her," and that two other men would watch Zita overnight. The next day, Solis and Cadenas went back to the house, where Solis stayed upstairs while Cadenas went into the basement. Solis and Cadenas later drove around while Cadenas talked on the phone and made arrangements to pick up the money. Solis drove to the restaurant where the money had been dropped off and agreed to pick up Cadenas around the block after he retrieved the money. As Solis began driving away, she was stopped by the police.

¶ 24    Solis also stated that she had been treated well by the police and ASA Buck, and was given food to eat and water and coffee to drink. No threats or promises were made to get her to make the statement, and she gave the statement freely and voluntarily. Solis could read and write English. Solis was allowed to make any changes or corrections and initialed accordingly.

¶ 25    According to ASA Buck, Solis never stated that she was afraid of Cadenas or that he threatened her to participate in the crime.

¶ 26    Solis testified in her defense. Defense counsel asked Solis about her experience with English, to which the State objected. The State noted, and the court agreed, that Solis had tried to

answer two previous questions before they were interpreted. When the trial court suggested that defense counsel was trying to establish that Solis's statement was not voluntary because she did not speak or understand English, defense counsel stated, "I'm not saying it was not voluntary." Defense counsel asserted that his questions would show that Solis's grasp of English was different from that of other people.

¶ 27    Continuing with her testimony, Solis stated that she had lived in the United States since she was 17 years old. During her relationship with Cadenas, he was mentally and physically abusive. At one point, Solis left Illinois for Texas with her children. Later, Solis moved back to Illinois because she "thought it was safer to be here so he wouldn't know." In January 2010, Cadenas found out where Solis lived and came to Solis's door, eventually moving in with her. Solis once overheard a phone call where Cadenas talked about killing someone. When Cadenas found out that Solis had overheard, he became very violent and threatened to kill Solis's children and sister if she told anyone about the conversation. At some point, Cadenas started talking about kidnapping somebody, though he did not say that he was thinking of kidnapping Zita or was going to commit a kidnapping. Solis suspected that Zita could be Cadenas's victim. Solis did not call the police because Cadenas had already made threats about her family, and Solis knew what Cadenas was capable of doing. Solis helped Cadenas because she was afraid of being seriously hurt or killed. She denied ever putting a bandage or mask over Zita's face, and speculated that her fingerprints were on the roll of duct tape because "maybe he took it from someplace in my house or car." Though Solis was driving on the day of the kidnapping, she "didn't know what they were doing."

¶ 28    Solis further testified that before she spoke to Detective Wojtowicz, she spoke to a Spanish-speaking officer who told Solis to say everything she knew. When the State objected on the basis

of hearsay, defense counsel stated, "I'm going to show what I expect her to testify to. That the policeman came in, said to her, don't worry. Say whatever the answer—all their questions. You don't need a lawyer. We're going to release you after you give the statement." The defense did not contend that "she was beaten," or "that she needs a motion to suppress." Rather, defense counsel was "trying to say that that would be a reason why she would sign anything. She's not going to testify she didn't say these things. But I want to show the jury that she thought she was going to go home." Returning to testimony, Solis asserted that her written statement did not necessarily contain everything that she said.

¶ 29    Solis testified that she did not remember making most of the statements in her typewritten statement, and that she did not read it before she signed it. Solis added that if ASA Buck read the statement, "I didn't even understand. I was very bad. *** I was not well."

¶ 30    In part, defense counsel stated in closing that if the jury decided that Solis "did some things," she was compelled to do them. Solis was terrified of the Zetas and Cadenas. Defense counsel described the circumstances surrounding the statement, including the amount of time that had passed, the location, "the feeling of loneliness, the hope that if she signs it, maybe they will — ***. This isn't a bad statement for [Solis]." Defense counsel added, "Nobody beat her. Nobody has threatened to kill her, except [Cadenas]. No one did that. So take it and read it." Solis did what Cadenas told her to do. Solis did not call anyone because she was trying to survive the best way that she could.

¶ 31    The jury instructions included an instruction on the affirmative defense of compulsion. After deliberating, the jury found Solis guilty of aggravated kidnapping.

¶ 32    Solis's posttrial motion asserted in part that the trial court should have allowed defense counsel to ask Solis about her knowledge of English, since that could have affected her ability to

understand the statement that she allegedly signed. It was for the jury to decide what facility, if any, Solis had with English when she allegedly made her statement. At a subsequent hearing, the court asked Solis if she understood what was being said that day. Solis stated that she did, but would like to "understand better," as sometimes she did not understand the legal terms being used. The court requested that the record reflect that Solis "has no problem understanding what I'm saying. She has absolutely no problems responding to my questions." The court denied the posttrial motion. After a sentencing hearing, Solis was sentenced to 25 years in prison.

¶ 33                                  C. Direct Appeal

¶ 34     On direct appeal, Solis contended that 1) her trial counsel was ineffective for not calling Solis's daughter to testify, 2) the State made improper comments during closing arguments, and 3) her sentence was excessive. *People v. Solis*, 2015 IL App (1st) 130379-U. This court rejected Solis's arguments and affirmed the judgment of the trial court.

¶ 35                          D. Postconviction Proceedings

¶ 36     On December 2, 2015, Solis filed a *pro se* postconviction petition that stated in part that her fifth amendment rights were violated because she was never told that she was under arrest and her *Miranda* rights were not read to her in a way that she could understand before she made her statement. Solis stated that she was bilingual, and at the time of her arrest, she spoke little English and read and wrote even less English. Solis asked for an interpreter while she was questioned, but one was not provided. Solis also stated that the ASA "asked questions and wrote what she wanted as the answers." Further, Solis's sixth amendment rights were violated because defense counsel instructed her to lie and did not fight to suppress her statement. In an attached memorandum of law, Solis stated in part that "[t]he interpreter the police brought in confused her more than if no interpreter had been brought in." Solis had no idea what she was initialing and signing.

¶ 37    Attached to the petition was an affidavit from Lorena Rivera, who averred that she was Solis's cell mate in the Cook County jail. Rivera recalled that Solis was a monolingual Spanish speaker and "had the most difficult perhaps perplexed time comprehending her legal situation/documentation." Solis had been frustrated because she was not able to read documents that pertained to her case.

¶ 38    On January 29, 2016, the circuit court docketed the petition for second stage proceedings and appointed counsel.

¶ 39    Through counsel, Solis subsequently filed a supplemental petition that asserted in part that Solis was denied effective assistance of counsel due to Carroll's complete failure to subject the State's case to meaningful adversarial testing, where Carroll invented a compulsion defense and instructed Solis to lie about it. According to an affidavit from Solis, Carroll told Solis to say that she was forced to participate in the kidnapping. This was a lie, as Solis did not know about the kidnapping until she was in the interrogation room. Also, just before Solis testified, Carroll told her that he would ask if she had been alone with "a friendly Latino police officer or detective," and she should state that this officer told her to say that she was not beaten, threatened, or mistreated. In actuality, there was no such Latino officer or detective. The affidavit added that Solis was threatened by an FBI agent who stated that unless she cooperated, he would put her picture and name on a billboard and take away her son. Further, Solis was not allowed to use the bathroom and was not given food or drink.

¶ 40    On August 4, 2017, postconviction counsel filed a certificate pursuant to Illinois Supreme Court Rule 651(c) (eff. July 1, 2017), stating that he had 1) consulted with Solis by phone, mail, and in person to ascertain her contentions of deprivation of constitutional rights, 2) examined the record of proceedings from trial, including the common law record, report of proceedings, and any

exhibits in possession of the clerk of the circuit court, and 3) made any amendments to the *pro se* petitions that were necessary to adequately present Solis's contentions.

¶ 41    Later, Solis submitted affidavits from three other people who averred that Carroll and his associate told them to lie during their court proceedings.

¶ 42    The State filed a motion to dismiss that, in addition to addressing other matters raised in the petition, asserted that Solis did not make a substantial showing of a constitutional violation based on her claims about understanding English. The State noted that the trial court found that Solis had a good command of English. Further, defense counsel's strategy was to demand trial, which allowed Solis to be tried separately from her codefendants. Counsel attacked Solis's statement during trial and was allowed to pursue the alleged involuntariness of the statement.

¶ 43    After a hearing, the circuit court granted the State's motion to dismiss on January 17, 2020, and denied the petition. In an oral ruling, the court rejected Solis's ineffective assistance claim, stating that Carroll tested the State's case as thoroughly as he could. The court did not believe that Carroll created a defense out of whole cloth. Solis's other claims—including her language-based claims—were found to be forfeited. Solis timely appealed.

¶ 44                                          II. ANALYSIS

¶ 45    On appeal, Solis contends that her petition made a substantial showing that her confession was involuntary and her constitutional rights were violated because her trial counsel did not litigate the motion to suppress. Solis argues that trial counsel performed deficiently because an FBI agent threatened her and she did not understand everything that was said to her in English during the interrogation, including the *Miranda* warnings. Solis further asserts that she made a substantial showing that a motion to suppress would have succeeded. Solis was subject to an extreme threat, and the trial court's belief that she could speak English is not dispositive. Solis gave one-word

answers to questions and the conversations were primarily limited to discussing continuance dates. Also, Solis testified that she did not remember saying several parts of the written statement, which supports that she did not understand everything that was said during the interrogation.

¶ 46    The Act provides a three-stage process for defendants to challenge their convictions on the basis of constitutional violations. *People v. Domagala*, 2013 IL 113688, ¶ 32. Postconviction proceedings begin by filing a petition in the circuit court where the conviction took place. 725 ILCS 5/122-1(b) (West 2014). The circuit court must dismiss the petition if it is frivolous or patently without merit. 725 ILCS 5/122-2.1(a)(2) (West 2014). If the circuit court does not dismiss the petition, then it advances to the second stage, where counsel may be appointed and the State may file a motion to dismiss or an answer to the petition. *Domagala*, 2013 IL 113688, ¶ 33. The circuit court determines whether the petition and any accompanying documentation make a substantial showing of a constitutional violation. *People v. Tyler*, 2015 IL App (1st) 123470, ¶ 145. The allegations in the petition are liberally construed, and all well-pleaded facts not positively rebutted by the record are taken as true. *People v. Sanders*, 2016 IL 118123, ¶¶ 31, 42. New evidence is positively rebutted if it is "clear from the trial record that no fact finder could ever accept the truth of that evidence, such as where it is affirmatively and incontestably demonstrated to be false or impossible[.]" *People v. Robinson*, 2020 IL 123849, ¶ 60. If the petition makes a substantial showing of a constitutional violation, then the petition advances to a third-stage evidentiary hearing. *Tyler*, 2015 IL App (1st) 123470, ¶ 145. We review a second-stage dismissal *de novo*. *Sanders*, 2016 IL 118123, ¶ 31.

¶ 47    Though we review the circuit court's judgment and not its reasoning (*People v. Munz*, 2021 IL App (2d) 180873, ¶ 27), we clarify that Solis's claim is not forfeited on the grounds that it was not raised on direct appeal. See *People v. Petrenko*, 237 Ill. 2d 490, 499 (2010) (issues that could

have been raised on direct appeal, but were not, are forfeited). As Solis correctly asserts, the direct appeal record did not contain the facts that an FBI agent threatened her and that she did not understand all of the conversations in English with the police. See *People v. Munson*, 206 Ill. 2d 104, 124 (2002) (no forfeiture where the defendant relies on matters *dehors* the record).

¶ 48    We also find that, contrary to the State's position, Solis's petition raised the claim that she asserts on appeal, and so is not forfeited for that reason either. See 725 ILCS 5/122-3 (West 2014) ("[a]ny claim of substantial denial of constitutional rights not raised in the original or an amended petition is waived"). The allegations that Solis was threatened by the FBI and did not understand her *Miranda* warnings and interrogation are linked to her claim that counsel should have sought to suppress her statement. See *Sanders*, 2016 IL 118123, ¶ 31 (question on appeal from a second-stage dismissal is whether the allegations in the petition, liberally construed in favor of the petitioner and taken as true, are sufficient to invoke relief).

¶ 49    Turning to the merits of Solis's claim, an ineffective assistance of counsel claim has two prongs: a defendant must show that counsel's performance was deficient, and the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The failure to establish either prong precludes a finding of ineffective assistance of counsel. *People v. Henderson*, 2013 IL 114040, ¶ 11. " 'A defendant is entitled to effective, not perfect, representation,' " which is determined from the totality of counsel's performance. *People v. Brown*, 2015 IL App (1st) 122940, ¶ 48 (quoting *People v. Ingram*, 382 Ill. App. 3d 997, 1006 (2008)). A defendant must overcome the presumption that " 'the challenged action might be considered sound trial strategy.' " *People v. Patterson*, 217 Ill. 2d 407, 441 (2005) (quoting *Strickland*, 466 U.S. at 689). Highly relevant here, the decision whether to file a motion to suppress evidence is "traditionally viewed as one of trial strategy," and counsel benefits from "a strong

presumption" that the failure to seek the exclusion of certain evidence was proper. *People v. Little*, 322 Ill. App. 3d 607, 611 (2001). To overcome the presumption, the defendant must demonstrate a reasonable probability that the motion would have been granted and that the outcome of the trial would have been different. *People v. Utley*, 2019 IL App (1st) 152112, ¶ 55.

¶ 50    While effective assistance includes " '[discharging] legal duties skillfully and ethically,' " it " 'does not *** contemplate clairvoyance.' " *People v. Sims*, 322 Ill. App. 3d 397, 409 (2001) (quoting *People v. Faulkner*, 292 Ill. App. 3d 391, 394-95 (1997)). Solis's counsel had to be aware of her allegations if he is to be found ineffective for not acting on them. Solis acknowledges that her petition does not state that she told her trial counsel that she was threatened by an FBI agent and could not understand her *Miranda* warnings and interrogation. Solis asserts that her trial counsel would have known these facts because her allegations indicate that she and counsel discussed what actually happened during her interrogation. Solis also notes that her first counsel, Bemben, filed a motion to suppress her statement.

¶ 51    On appeal from a second-stage dismissal, the question is whether "the allegations in the petition" are sufficient to invoke relief. *Sanders*, 2016 IL 118123, ¶ 31. Solis's ineffective assistance claim cannot succeed because it does not state that she told her counsel that she was threatened by the FBI and did not understand her *Miranda* warnings and interrogation. The unlitigated motion to suppress does not fill in the gap, as it does not detail the specific grounds for the motion, other than to generally state that she experienced "psychological and mental coercion," and was told "certain material misrepresentations." Solis's trial counsel cannot be ineffective for failing to seek suppression of her statement based on circumstances he was not told about. See *People v. McKinney*, 2011 IL App (1st) 100317, ¶ 47 (ineffective assistance claim was without

merit where the record did not indicate that the defendant told defense counsel about an alibi witness that the defendant alleged should have been called to testify).

¶ 52    The record also indicates that Solis's trial counsel—Carroll and his associate—made a strategic decision not to litigate the motion to suppress. Solis's first attorney, Bemben, filed a motion to suppress Solis's statement, but withdrew the motion after Solis hired new counsel. Shortly after appearing on the case, Carroll and his associate demanded a speedy trial. As the State points out, demanding a speedy trial allowed Solis to be tried separately from her codefendants. Solis's statement was used at trial as part of a compulsion defense, and counsel explicitly denied that the motion should be suppressed or that the statement was involuntary. Solis's counsel tried to explain the circumstances surrounding the statement, including Solis's state of mind. That the strategy was unsuccessful does not overcome the presumption that the strategy was sound. *People v. Massey*, 2019 IL App (1st) 162407, ¶ 31. Claims of ineffective assistance must be judged from the time of counsel's conduct. *People v. Randall*, 2021 IL App (1st) 191194, ¶ 76. It was not unreasonable for counsel to separate Solis from her codefendants, and at trial, pursue an affirmative defense and try to explain the statement.

¶ 53    There is also no reasonable probability that a motion to suppress would have been granted. For a defendant's confession to be admitted, the defendant must have knowingly and intelligently waived the privilege against self-incrimination and right to counsel. *People v. Reid*, 136 Ill. 2d 27, 54 (1990). A court considers "the totality of the circumstances, including the characteristics of the defendant and the details of the interrogation, without any one circumstance or factor controlling." *Id*. at 54-55. Intelligent knowledge " 'need not mean the ability to understand far-reaching legal and strategic effects of waiving one's rights.' " *People v. Mahaffey*, 165 Ill. 2d 445, 462 (1995) (quoting *People v. Bernasco*, 138 Ill. 2d 349, 363 (1990)). A defendant " 'must at least understand

basically what those rights encompass and minimally what their waiver will entail.' " *Id*. (quoting *Bernasco*, 138 Ill. 2d at 363). Solis's allegation that she could not understand her *Miranda* warnings and interrogation is positively rebutted by the record, which leaves no doubt that Solis understood English. Solis participated in several exchanges with the trial court in English, including about her attorney having a pending complaint before the ARDC and her level of English fluency. Solis also stated at several points that she spoke English and could understand "probably 80 percent." The trial court remarked throughout the trial that Solis spoke and understood English. At one point during her testimony, Solis answered questions before they were interpreted. Also, ASA Buck testified at trial that Solis indicated that she understand her *Miranda* rights by answering "yes" after each right was read to her. The affidavit from Rivera that was attached to Solis's postconviction petition does not mention Solis's interrogation, and Rivera's description of Solis as monolingual is flatly contradicted by Solis's own statements during the trial court proceedings. Further, that Solis had an interpreter at trial—or at the police station, as she alleged in her petition—does not mean that she did not understand English. See *People v. Calvillo*, 170 Ill. App. 3d 1070, 1082 (1988) (that the defendant was advised of his *Miranda* rights in Spanish and English did not mean that the defendant did not understand the rights when they were given in English). The trial court would not have suppressed Solis's statements on the basis of her English proficiency.

¶ 54     Further, Solis's petition did not include support for her allegation that an FBI agent threatened her. To make a substantial showing of a constitutional violation, a defendant must support factual allegations in the petition by affidavits, the record, or other evidence containing specific facts (*People v. Stein*, 255 Ill. App. 3d 847, 848 (1993)), which Solis did not do. Meanwhile, Solis noted in her statement that she had been treated well by the police and ASA

Buck, no threats or promises were made to get her to make the statement, and she gave the statement freely and voluntarily. A motion to suppress would not have succeeded, and Solis has not made a substantial showing that her trial counsel was ineffective.

¶ 55    Solis next contends that to the extent that her *pro se* petition did not adequately present her ineffective assistance claim, her postconviction counsel provided unreasonable assistance by not amending the petition to include that Solis told her trial counsel that she was not fluent in English during the interrogation and an FBI agent threatened her. Solis argues that the petition should have presented her ineffective assistance claim more clearly and fully.

¶ 56    The right to the assistance of counsel during postconviction proceedings is "a matter of 'legislative grace.' " *People v. Gallano*, 2019 IL App (1st) 160570, ¶ 24 (quoting *People v. Bell*, 2014 IL App (3d) 120637, ¶ 10). The Act requires that counsel provide a reasonable level of assistance (*Gallano*, 2019 IL App (1st) 160670, ¶ 24), which is less than that afforded by the federal or state constitutions (*People v. Collins*, 2021 IL App (1st) 170597, ¶ 30). Illinois Supreme Court Rule 651(c) (eff. July 1, 2017) imposes three duties on appointed postconviction counsel. *People v. Profit*, 2012 IL App (1st) 101307, ¶ 18. Postconviction counsel must 1) consult with the defendant by phone, mail, or electronic means or in person to ascertain her contentions of deprivation of constitutional rights, 2) examine the record of the proceedings at trial, and 3) make any amendments to the *pro se* petition that are necessary to adequately present the defendant's contentions. Ill. S. Ct. R. 651(c) (eff. July 1, 2017). The filing of a 651(c) certificate—as was done here—creates a rebuttable presumption that postconviction counsel provided reasonable assistance. *Collins*, 2021 IL App (1st) 170597, ¶ 31. A defendant has the burden to overcome this presumption by demonstrating that counsel failed to substantially comply with the duties imposed

by Rule 651(c). *Id*. We review *de novo* whether counsel provided a reasonable level of assistance. *People v. Wallace*, 2018 IL App (5th) 140385, ¶ 31.

¶ 57    Solis has not overcome the presumption that counsel made any necessary amendments to her petition. Counsel is appointed " 'not to protect [defendants] from the prosecutorial forces of the State, but to shape their complaints into the proper legal form and *** present those complaints to the court.' " *People v. Pinkonsly*, 207 Ill. 2d 555, 568 (2003) (quoting *People v. Owens*, 139 Ill. 2d 351, 365 (1990)). If an amendment would only further a frivolous or patently nonmeritorious claim, then it is not "necessary" within the meaning of Rule 651(c). *People v. Greer*, 212 Ill. 2d 192, 205 (2004). Even if Solis's petition had been amended to state that Solis told her trial counsel about not understanding her *Miranda* warnings and interrogation and that she was threatened by an FBI agent, her ineffective assistance claim would still be meritless. As discussed above, trial counsel chose not to move to suppress Solis's statement as a matter of trial strategy. Also, the record makes plain that Solis knew enough English to understand her *Miranda* warnings and interrogation, and her statement that she was threatened by the FBI was otherwise unsupported. Postconviction counsel provided reasonable assistance.

¶ 58                                    III. CONCLUSION

¶ 59    For the foregoing reasons, the judgment of the circuit court is affirmed.

¶ 60    Affirmed.